No. 82-462

IN THE SUPREME COURT OF THE STATE OF MONTANA

1984

STATE OF MONTANA,

Plaintiff and Respondent,

-vs-

JOSEPH KUTNYAK,

Defendant and Appellant.

APPEAL FROM: District Court of the Fourth Judicial District,
In and for the County of Ravalli,
The Honorable Arthur B. Martin, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Jeffrey H. Langton argued, Hamilton, Montana

For Respondent:

Hon. Mike Greely, Attorney General, Helena, Montana
Dorothy McCarter argued, Asst. Atty. General, Helena
Robert B. Brown, County Attorney, Hamilton, Montana
Margaret Tonon aruged, Deputy County Attorney, Hamilton,
Montana

Submitted: March 15, 1984

Decided: July 3, 1984

Filed: JUL 3 - 1984

*Ethel M. Harrison*
Clerk

Mr. Justice John Conway Harrison delivered the Opinion of the Court.

This is an appeal from the District Court of the Fourth Judicial District, County of Ravalli, from the conviction of the crime of mitigated deliberate homicide following a jury trial. The appellant, Joseph Kutnyak, was sentenced to thirty years in the State Prison.

We affirm.

The appellant shot and killed Charles Hayes on February 19, 1982. Prior to this killing there were a number of rather complicated incidents and contradictory facts concerning the relationship of the two men in the spring of 1978. The decedent, Hayes, had purchased land in the West Fork area of Ravalli County, known as the Hughes Creek Drainage. He had moved to the State of Montana from Nevada where he had spent some time in a Nevada jail on an assault conviction after shooting a man in a bar fight. Following his arrival in Montana, he built a cabin in an isolated area to be occupied by himself and his wife. During this building period, his wife Susan worked in Nevada and visited him periodically to assist in the building of the cabin. She did not move to Montana until February of 1979.

According to the record, the first contact that Hayes and his wife had with any member of the Kutnyak family was in the late spring of 1979 when they met Debbie Kutnyak in Darby, Montana. They felt sorry for her inasmuch as she was out of work and in need, and invited her to stay in their home until she could find a place to live. According to Susan Hayes' testimony Debbie Kutnyak and her child stayed

at the cabin for some time. Susan assisted Debbie and her child in making arrangements to get housing. Debbie told the Hayes family that her husband had been killed in a mine accident in Colorado. This proved to be false, for a short time later, after Debbie located a cabin in the Hughes Creek area, her husband joined her, and the family took up residence.

Sometime later in September 1979, Hayes and several other persons terrorized the appellant and his family by arriving after dark one night, shouting and shooting at the cabin that housed the appellant's family. According to the appellant and his wife, this went on for several hours during the night. The next morning he and his wife went to town to see the county attorney to have aggravated assault charges filed against Hayes and his companions. As a result of these charges being filed against Hayes and his companions, the deceased was put on probation for a five-year period, was ordered not to have any guns in his house or in his possession and was directed not to have more than .05% blood alcohol count at any time during his probation period.

Following his conviction and placement on parole, there were numerous incidents testified to by the appellant, Susan Hayes and other witnesses for the State, showing that Hayes violated the conditions of his parole. From the testimony produced at trial there is little dispute that Hayes violated the conditions of his parole with impunity. His parole officer, Sally McRae, testified that she felt that she had an improving relationship with him during the period of parole but acknowledged that he was "very angry

and hostile toward law enforcement." She had an arrangement with him that he would report in once a month. During the winter months when the area in which he lived was snowed-in, he would send a report out by mail which the Postal Service covered twice a week.

In addition to the above facts concerning the hostility of Hayes and his violations of the parole provisions, there was testimony by the sheriff's office that it had some problems in the Hughes Creek area involving Hayes pertaining to miners who were exercising mineral rights in the area; problems with private citizens or law enforcement people in the area; problems involving people either fishing or cross-country skiing who were made aware of Hayes' possessive tendencies concerning the property near his cabin involving the use of his Doberman dog.

Following the 1979 aggravated assault incident, the record shows that the Kutnyak and the Hayes families did not have any contact with each other until the summer of 1980, when they met at a hot springs just over the divide from their property and decided to try and reestablish a friendly relationship. From that time until Hayes' death, there was contradictory testimony as to the relationship between the parties. Hayes' wife testified in detail as to the contacts between the parties, including but not limited to the exchange of presents on birthdays and Christmas, exchange of dinners, hunting trips and trades made for supplies and for marijuana. Hayes grew marijuana on their plots for personal use and for trading purposes in the area. There is also testimony that the two men hunted together. Also, the Kutnyak family would stay with Susan Hayes while the men

were out hunting. There was also testimony from other State witnesses showing that the two men appeared to get along and did not exhibit hostile behavior in their presence.

On February 1, 1982, Ken and Lisa Schultz, neighbors of the Kutnyaks, stopped at the Kutnyaks' residence after returning late from town and stayed there until approximately 4:00 a.m. listening to the appellant's stories about Chuck Hayes. The appellant related many stories which would be repeated to other persons over the next several weeks concerning Chuck Hayes' alleged threats to the appellant and to his family; his efforts at trying to get the appellant to commit crimes for him and similar stories. Ken Schultz became so concerned about the situation that he reported it to Detective Pete Clarkson of the Ravalli County Sheriff's office. Schultz told him that there might be problems brewing in the West Fork area.

Clarkson traveled to the West Fork shortly thereafter to meet with Ken Schultz and another neighbor, John Houston, both of whom told the detective the stories they had been told by the appellant. Neither of the men had independent information which they could supply to the detective other than what had been told to them by the appellant. Later, at a subsequent meeting at the home of John Houston, Clarkson took statements from Houston and Ken Schultz. After hearing the tapes of that meeting, it was agreed that the sheriff's office and the probation office still lacked probable cause for a search warrant, and a meeting at the appellant's home was set up for February 19, the date of the homicide. The purpose of this meeting was to attempt to observe Hayes in violation of his parole.

On the early morning of February 19, 1982, Detective Clarkson, Probation Officer Sally McRae and Undersheriff Ron Fisher left the sheriff's office and arrived at the appellant's home at approximately 9:00 a.m., at which time appellant and his wife and children were present. The appellant had been made aware of their coming and agreed to their plan, which was to observe Hayes to see whether or not he had any kind of a weapon on him. After arrival at the appellant's home, the three law enforcement officers donned bullet-proof vests and took various positions in the cabin. Shortly after their arrival the appellant had his wife and their two children go to a home of a neighbor so they would not be in any danger.

During their wait, the three officers listened to appellant talk "non-stop," reiterating what they had previously been told about Hayes. In addition, during this time, the appellant told McRae and Clarkson in detail how he would kill Chuck Hayes. In his various talks with John Houston, the appellant had previously told Houston how he would shoot Chuck Hayes and that when he saw him he was going to bad mouth him and provoke him into drawing his gun. As the morning grew later and Hayes did not appear, Sally McRae said that it would be necessary for her to go to town because she had an appointment. She testified that they had been told by the appellant that Hayes would arrive for his mail anytime between 9:30 a.m. and 11:00 a.m. At 12:15 p.m. the three finally left to return to town. According to the appellant, Hayes arrived at the mailbox in front of his house fifteen minutes after the three law enforcement officers' departure. One of the interesting factors

testified to by all three officers was that, after they notified the appellant that they were returning to town, he began to ask questions about what constituted self-defense. Before the officers left, they suggested that if Hayes came that day, the appellant should not answer the door.

According to the appellant's statement, Hayes drove up on his snowmobile, parked it near the mailboxes, came to the Kutnyak cabin and rapped on his door. He testified that he did not answer the door and waited awhile until Hayes went back to his snowmobile. Appellant then ruffled-up his hair, opened the door and told Hayes that he had been sleeping. Hayes entered the cabin, took off his pistol holster and put it on the table. The two men then spent sometime together smoking marijuana and drinking. Appellant testified that, as Hayes was about to leave, Hayes insulted him and told him that he would kill him. Hayes picked up his gun, put it back on and walked to his snowmobile. Appellant followed him outside, carrying his 12mm semi-automatic pistol in the back of his pants.

The testimony concerning what happened, of course, is that of the appellant. He testified that after Hayes got next to the snowmobile, he pulled out his gun and shot Hayes five times. He then claimed, in a statement made to the sheriff, that he walked over to Hayes, tapped Hayes' gun back into his holster, walked back into the cabin, had a cup of coffee and then went to tell a neighbor what had happened.

The neighbor notified the sheriff's office. The deputies arrived at the scene about an hour and a half to two hours later, just before dusk. They arrested the

appellant at the scene and placed him in the Ravalli County jail. At the time of the arrest, Kutnyak was advised of his Miranda rights and he gave the officers statements as to what had happened.

Approximately a month after his arrest, appellant asked to see the Sheriff of Ravalli County. When the sheriff arrived at his cell, the appellant began clarifying his statements made the day of the shooting. He asked the sheriff to help reenact the shooting and attempted to demonstrate the transactions occurring at that event. This was done without a Miranda warning or having any attorney present, even though he had previously been assigned counsel.

In preparation for trial, the trial court ordered the State to make available all of its material in the case. Later, after the jury verdict and sentence, the sheriff's office discovered a file that included a letter from some cross-country skiers complaining that Hayes and his dogs had harrased them. That letter was not received by counsel prior to trial. An investigation revealed that one of the deputy sheriffs had, for investigative purposes, set up a file of people who lived in the county who might be contributing to disturbances. The deputy had permission from the sheriff to have such a file, and it was generally known in the sheriff's office that the file was available. At the time the request was made for all material the county attorney had concerning the case, this file was overlooked and was not produced until after trial at which time counsel for the appellant moved for a new trial.

Five issues are raised on appeal:

(1) Was the jailhouse statement made by appellant to the sheriff admissible?

(2) Did the court err by admitting the evidence of appellant's alleged prior threats against an unrelated third party?

(3) Did the court err in denying appellant's motion for a new trial following the discovery of a file that was not turned over him?

(4) Did the court violate appellant's constitutional rights by forcing him to testify in order to maintain his self-defense instructions?

(5) Did the State present sufficient evidence to support a conviction of mitigated deliberate homicide?

The first issue is whether there was a violation of appellant's right to presence of counsel during his jailhouse statement to Sheriff Dye. Due to the unusual facts of this case, the trial judge ordered counsel to brief the law on this point and held a hearing on the same before ruling that the statement to the sheriff was admissible. It is the appellant's contention that the court erred in permitting Sheriff Dye to testify about a jailhouse statement made by the appellant because there was no Miranda warning given, and because counsel was not present at the time of the statement and therefore there was a violation of the appellant's Sixth Amendment right to counsel.

The District Court properly denied appellant's motion to suppress. We hold that, when the appellant asked to talk to Sheriff Dye, he volunteered the information about his participation in the crime in an atmosphere free from coercion. He had been previously given a Miranda warning at

the time of his first confession. Therefore, it was not error to admit the evidence of his admissions at trial. Rhode Island v. Innis (1980), 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297; Brewer v. Williams (1977), 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424; Michigan v. Tucker (1974), 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182; Massiah v. United States (1964), 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246; Spano v. United States (1959), 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265; Commonwealth v. ~~Muham~~ *Meelham* (1979), 377 Mass. 552, 387 N.E.2d 527; 29 Am.Jur.2d Evidence, section 622.

We also hold that the testimony cannot be excluded as the fruit of a suppressed statement. Absent a direct infringement on Fifth Amendment rights, a violation of the rules of Miranda will not support the exclusion of evidence derived from the statement, Tucker, supra. If appellant's statement had been induced by police threats or promises of leniency, the statement would be involuntary and the evidence derived inadmissible. See Muham, supra. However, here the trial court determined, after a hearing, that the statement made was voluntary, and we will not disturb the court's findings. Since the statement cannot be traced back to either a Fourth or Fifth Amendment violation, we hold that its admission was proper.

Last but not least the State counters the argument of the appellant that Rule 701, Mont.R.Evid. required the denial of the admission of the sheriff's statement. The appellant argued that the sheriff's statement was a self-serving declaration and was not admissible as proof of the facts asserted, regardless of whether they were implied by acts or conduct, were made orally or whether reduced in

writing, citing 29 Am.Jur.2d Evidence, section 622. Rule 701 of the Montana Rules of Evidence states:

> "If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clearer understanding of his testimony or the determination of the fact and issue."

We hold that the evidence was offered to provide the jury with a complete accounting of the conversation between the appellant and Sheriff Dye. Prejudice is not presumed when error is alleged. If error occurred, then prejudice must be demonstrated. Here no error occurred. If there was error, it was harmless and not grounds for reversal. See State v. Lapp (Mont. 1983), 658 P.2d 400, 40 St.Rep. 120; State v. Fitzpatrick (1980), 186 Mont. 187, 606 P.2d 1343.

The second issue is whether the District Court erred in allowing testimony, contrary to prior court ruling and over objection, concerning alleged prior threats by appellant against an unrelated third party.

Prior to trial, counsel for the appellant submitted a motion to exclude prejudicial evidence. He requested, in relevant part, that the court instruct the prosecutor and her witnesses not to directly or indirectly mention, refer to, or question, " . . . any matters or things pertaining to Defendant's prior prosecutions, convictions, arrests, and any uncharged criminal acts of Defendant or any defense witnesses on the basis of Rule 404 Montana Rules of Evidence and cases thereunder."

Rule 404(b), Mont.R.Evid., provides as follows:

> "Evidence of other crimes, wrongs, or acts is not admissible to prove the

character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

Prior to the opening of the State's case, the court granted the motion in limine as to prior bad acts of the appellant. During cross-examination, the State, after asking a series of questions concerning the appellant's relationship with his neighbors, asked these questions:

"Q. [counsel for the State] Specifically, did you ever threaten any of your neighbors?

"A. [appellant] I don't believe I did.

"Q. Never?

"A. Never."

At that time, counsel for the State asked the trial judge whether she could approach the bench, saying that she intended to get into an area where a preliminary ruling might be needed. Subsequently, respective counsel met in chambers, and the following dialogue took place:

"MS. TONON: [counsel for the State] At the commencement there was a motion granted by the court to prevent the prosecution from discussing any prior crimes of the defendant. Before getting in it, so I don't get jumped on until I get into it, I intend to ask Mr. Kutnyak if he had any reason to dislike the Gosses or any reason to dislike the Houstons. Should he answer no, I then intend to indicate that he's telling a falsehood and he obviously did have a reason to dislike the Gosses because of the cow shooting.

"MR. LANGTON: [counsel for appellant] Why is it relevant?

"MS. TONON: Why is it relevant? The ultimate goal is that every single feeling or comment he has expressed about Chuck Hayes is what he, himself, was

-12-

feeling, and he just turned it around and applied it to Chuck Hayes. It's obvious that he disliked the Gosses. Based on that, I intend to have a witness who will testify that he threatended to kill the Gosses, since he's just denied making a threat.

"THE COURT: This doesn't indicate conviction or crime by him.

"MR. LANGTON: There was a charge brought by the Gosses against Mr. Kutnyak's wife, Your Honor, in relation to shooting some cattle. She was tried and acquitted by a jury. I don't see anywhere--

"THE COURT: The incident itself may have some relevance. I don't know what you need to bring, under the circumstances, the acquittal out or, if you don't want that done, you may want to be the one to bring that out.

"MS. TONON: The incident with Houstons that I anticipate John Houston, on rebuttal, would testify to, depending on what Mr. Kutnyak says, that he was the one that turned in Joe [Kutnyak] for the theft of some lumber and he also set up a roadblock for some potential poaching, which turned out to be nothing, but that would be a reason for Joe to have ill feelings against the Houstons, which he all of a sudden explains what Chuck had against the Houstons.

"MR. LANGTON: Counsel is trying to slip in, through the back door, a whole string of allegations and alleged crimes which this court has already ruled on that cannot be brought up.

"MS. TONON: Not for the trial but to prove motive or intent.

"MR. LANGTON: Why would that prove motive to kill Hayes?

"THE COURT: As I interpret that statute you cannot bring up alleged crimes committed by the defendant himself. Now, if you can tie differences between these parties that may have resulted in the prosecution of someone else, I see no grounds preventing you from doing so.

"MS. TONON: All I intend, at this point, is we tie it up with another witness, whether he had any particular bad

-13-

feelings against Mr. Houston, and if he says no, then I would ask if he'd had any run-ins with Mr. Houston and his answers to those goes to his credibility.

"MR. LANGTON: That would be putting him in the intolerable position where there is no-- The State intends to bring up prior crimes. The only thing that the State has, there is not any legitimate possible motive to kill Hayes. Now, the fact that he had disputes with Mr. Goss over some cattle within his garden, with Mr. Houston over alleged poaching has nothing to do with any motivation to kill Hayes and I would object strenuously.

"THE COURT: I think it goes to impeachment. I'm going to allow you to proceed on this witness."

Thereafter on cross-examination, the State elicited from witnesses the fact that some threats had been made by the appellant against Steve Goss and John Houston.

The appellant argues that the court erred in allowing the testimony that appellant had made prior threats to third parties, in a violation of Rule 404, Mont.R.Evid. The appellant cites State v. Case (Mont. 1980), 621 P.2d 1066, 37 St.Rep. 2057, and State v. Just (1979), 184 Mont. 262, 602 P.2d 957, in support of his argument that the evidence was admitted without any tendency to establish a common scheme, plan or system; therefore, it was inherently prejudicial.

The State contends that the testimony was given not to show the similarity of other crimes or wrongs committed by the appellant, but to impeach his claim that he got along with his neighbors and never threatened them. Doing so it relies on State v. Austad (Mont. 1982), 641 P.2d 1373, 39 St.Rep. 356, for support that evidence may be admissible under "other purposes" as a means of impeachment. In Austad, supra, this Court noted: "The rules of evidence were not intended to muzzle the State against the defendant's

-14-

deliberate attempts to mislead jury members by lying to them and answering specific questions." 641 P.2d at 1384, 39 St.Rep. at 369. Here the appellant attempted to do just that in his statements that he got along with his neighbors. No questions were asked concerning prior misdemeanors or felonies. Rather, the question was an attempt to show that he was a not a peaceable member of the community. We hold the evidence admissible for that purpose. State v. Case, supra, and State v. Just, supra, are distinguishable because those cases involved attempts to show similarity of crimes.

The third specification of error is whether the failure of the prosecution to turn over the sheriff's "intelligence" file to appellant's counsel warranted a new trial.

In preparation for trial, counsel for the appellant made a demand on the county attorney's office that all information concerning the case be made available to him in preparation for trial. The county attorney's office turned over everything it had on the case to defense counsel. Several months after the conviction it was discovered that there was a copy of a petition by a number of neighbors in the area concerning Charles Hayes and the fact that he was an ex-convict and was allowed to have firearms in his possession. In addition, it was found that in the Ravalli County sheriff's office there was an undisclosed "intelligence" file on the decedent, Charles Hayes. The file had been compiled by sheriff's deputies during 1979 and was in the custody and control of Deputy Sheriff Pete Clarkson, the chief investigating officer in connection with this case.

The "intelligence" file was simultaneously discovered by the assistant county attorney and defense counsel in a search of the sheriff's department files on January 12, 1983, some five months after the conviction. The appellant, on the basis of this newly discovered information, filed a motion to stay the appeal and remand the case to the District Court for an evidentiary hearing on whether a new trial was warranted. Following the receipt of briefs and a hearing before Judge Martin, the trial judge, a new trial was denied. It should be noted that the file contained the petition by the neighbors and correspondence between the Ravalli County sheriff's office and the sheriff in Pioche, Nevada, where the Hayes family had previously lived and Charles Hayes had been involved in a shooting in a local bar.

The appellant claims the State suppressed the "intelligence" file purposely and that the file contained evidence about Hayes' bad character. In addition, appellant alleges that had he had the names of the people that signed the petition, he would have called them as witnesses as to Hayes' bad character. The State replied that the material in this file was cumulative of evidence that came in during the trial and therefore not prejudicial. In addition, the State denied it purposely suppressed the file in question.

As previously noted, this Court ordered a hearing by the trial court on the question raised by the appellant. Following an extended hearing, the trial court made findings of fact and conclusions of law, and denied a new trial. In its conclusions of law, the court found that:

(1) There was no deliberate suppression by the sheriff

or the county attorney of any of the appellant's exhibits offered and received in the hearing.

(2) The failure of the State to provide these exhibits was caused by inadvertence and was not prejudicial to the appellant. There was abundant evidence produced by both the appellant and the State, as to what the absent witnesses would or could have testified. Any evidence that might have been given by the signatories of the petition would therefore be cumulative.

(3) While the evidence that the signatories might have given relating to the appellant's prior threats and propensities was material to finding the appellant guilty of a lesser offense of mitigated deliberate homicide, it was not material to the defense of use of justifiable force under the circumstances. The testimony would not alter the court's sentence and judgment.

(4) There was no reasonable doubt of appellant's guilt and the additional evidence that might have been adduced by persons mentioned in the "intelligence file" would merely be cumulative.

We have carefully examined the so-called secret file and the evidence contained therein and find no error on the part of the district judge in refusing to grant a new trial.

This Court in State v. Higley (Mont. 1980), 621 P.2d 1043, 37 St.Rep. 1942, in ruling on a similar situation, where the trial court refused to grant a new trial concerning alleged new evidence, noted:

> "Section 46-16-702, MCA, governs the District Court's decision to grant a new trial. The district judge may do so if 'required in the interest of justice.' That decision is based on the discretion of the trial judge and will not be

overturned unless this Court finds an abuse of discretion. State v. Lewis (1978), 177 Mont. 474, 582 P.2d 346 at 351.

"This Court has noted that applications for new trials on the ground of newly discovered evidence are not favored, for the reason that the defendant has already had ample opportunity to prepare and present his case. State v. Greeno (1959), 135 Mont. 580 at 586, 342 P.2d 1052 at 1055. However, in certain instances, the information discovered may require a new trial. In Greeno, supra, this Court set out certain rules:

"'(1) That the evidence must have come to the knowledge of the applicant since the trial;

"'(2) that it was not through want of diligence that it was not discovered earlier;

"'(3) that it is so material that it would probably produce a different result upon another trial.' [Citations omitted.]

"Certainly, each case must be decided on its own facts. In the present case, we find that the evidence could have been discovered with due diligence." 621 P.2d at 1055, 1056, 37 St.Rep. at 1955, 1956.

The District Court did not abuse its discretion in denying the motion for a new trial. Despite the existence of newly discovered evidence, the judge was correct in finding inferentially under (3) of Greeno, that it was not so material that it would have produced a different result upon another trial.

The next issue concerns whether the District Court erred by compelling the appellant to testify, contrary to his right against self-incrimination or pain of forfeiture of his affirmative defense of justifiable use of force. In the case at bar the appellant asserted the defense of justifiable use of force. He argues that under Rule 404,

-18-

Mont.R.Evid., the defense may introduce evidence tending to show the decedent was likely to be the first aggressor due to his reputation and specific acts of turbulence or violence. We do not agree with appellant's argument. Self-defense is an affirmative defense and once raised he assumes the burden of proof. If he desires to raise this defense but cannot prove it without his own testimony, that is his choice.

Prior to the opening of the State's case, the court stated:

> "Now, we had some motions here, at least, I'm going to determine early. The one I haven't ruled on, the Motion in Limine, I'm going to deny that motion with qualifications. The Court is going to assume, based upon the notice that has been given, that the Defendant Kutnyak will take the witness stand and thereby lay a foundation for any examination prior to that of other witnesses called by the State or the Defense. If the Defendant should choose not to take the stand, then he will run the risk of being denied an instruction on self-defense. Now, that just about compels him to take the stand if he wants to use it."

At that point, the defense counsel neither objected to the ruling of the trial judge nor asserted that his client could not be compelled to testify to establish self-defense. In addition, he never stated during trial or on appeal that he would not have had his client testify if the trial judge had not made that ruling.

This Court in State v. Logan (1970), 156 Mont. 48, 473 P.2d 833, held that under our law the issue of self-defense and the aggressor be raised before evidence of the decedent's prior threats and acts of violence may be admitted. Until self-defense and the question of who was the aggressor is brought into evidence, such evidence is not

-19-

relevant. We noted in both State v. Breitenstein (1979), 180 Mont. 503, 591 P.2d 233, and State v. Jennings (1934), 96 Mont. 80, 28 P.2d 448, that the trial judge has the discretion to allow such testimony when the proper foundation has been laid. Here the trial judge determined that a proper foundation for evidence of Hayes' reputation for violence and turbulence was not established at the time of the State's motion in limine. However, he denied the motion with the understanding that defense counsel would later establish the foundation; that appellant would testify as to his own fear of apprehension based on Hayes' reputation; and that he would need to have other witnesses testify as to Hayes' violence of which the defendant had no knowledge.

Under the circumstances of the homicide here, the facts were such that without the appellant's testimony, he could never have met his burden of proof of self-defense or that Hayes was the aggressor. If the appellant's testimony were to be disregarded in the event error was found, the record could not support reasonable doubt on the part of any rational juror as to his guilt on the basis of self-defense, and the record would still contain substantial evidence to support the conviction. Therefore, any error in this regard must be disregarded. See State v. Grady (1975), 166 Mont. 168, 531 P.2d 681.

This Court has previously held that there are cases in which the appellant must testify to raise the issue of self-defense and meet this burden of proof. See Logan, supra.

Here the trial judge determined that the appellant

would need to testify as to his personal knowledge of Hayes' violent propensities and prior threats in establishing the aggressor, in order to lay the proper foundation for corroborating evidence thereof. The fact that the appellant had to testify or else risk not sufficiently establishing self-defense does not, under these circumstances, create a constitutional denial of his privilege against self-incrimination.

Finally, appellant argues that the conviction is not supported by substantial evidence because the State did not prove beyond a reasonable doubt that appellant had no reasonable belief that deadly force was unnecessary. Under the decisions of both this Court and the United States Supreme Court, the standard of review of the sufficiency of evidence is: "Whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." See, Jackson v. Virginia (1979), 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573; State v. Doney (Mont. 1981), 636 P.2d 1377, 38 St.Rep. 1707; State v. Wilson (Mont. 1981), 631 P.2d 1273, 38 St.Rep. 1040. "Substantial evidence" is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." See State v. Johnson (1982), 197 Mont. 122, 127, 641 P.2d 462, 465; Wilson, 631 P.2d at 1278, 38 St.Rep. at 1047.

Reviewing the record, we find that substantial evidence was presented to the jury. In summary the evidence is that: (1) The appellant knowingly or purposely provoked use of force by Hayes against himself, that he deliberately

arranged to manipulate Hayes into drawing his gun so Kutnyak could shoot him. (2) The appellant failed to exhaust every reasonable means to escape the danger. In his statement to Deputy Sheriff Clarkson, made shortly after the homicide, Kutnyak stated:

> "[I]f I need you Mr. to pull out your gun mister, to pull out your gun and use it on me, then f___ go ahead do it, if that's what I require for proof, go ahead do it, don't tell me your going to kill me, because you have been telling me that for 2 f_____ years. Do it."

(3) John Houston, a neighbor of the appellant, had invited Kutnyak to his home two days before the shooting. They talked for four hours, and during that time Kutnyak told him that he was going to provoke Hayes into drawing his gun, and then he would shoot Hayes. (4) On the day before the shooting, Kutnyak made a statement to Deputy Pete Clarkson indicating that he might shoot Hayes. (5) On the morning of the shooting, Deputy Clarkson, Undersheriff Fisher, and Probation Officer Sally McRae were at Kutnyak's house waiting for Hayes to arrive. Clarkson and McRae each testified that Kutnyak described how he planned to kill Hayes. Clarkson testified that Kutnyak stated that he would be sitting to the right of Hayes, then he would utter a phrase that would catch Hayes off guard. He would then grab Hayes' right arm, draw his automatic and shoot him in the face. McRae testified that Kutnyak described where he and Hayes would be seated, that Kutnyak would make a comment to him that "he should start wearing a dress," and "something else" to provoke Hayes into reaching for his gun. Then Kutnyak was going to grab Hayes' arm with one hand and pull his gun with the other and shoot him in the face. (6)

Clarkson, Fisher and McRae, as well as the defendant himself, each testified that during that morning, Kutnyak asked about shooting in self-defense. (7) Kutnyak's own testimony established provocation of Hayes just prior to the shooting. He knew that Hayes was not to be trusted and was unpredictable with guns when he drank. He also knew that Hayes did not like the police, that he tended to react violently with persons who discussed him with the police, and that he would be in physical danger if he let Hayes know that he talked to the police about him. (8) Kutnyak also knew that the morning of the shooting, Hayes was in a bad mood and was drinking alcohol and smoking marijuana. (9) After Hayes had been drinking and smoking for two hours, Kutnyak told Hayes for no apparent reason that Houston had said he should wear a dress with his ponytail--Houston had never said any such thing. According to Kutnyak's testimony, Hayes got mad, told Kutnyak he was going to kill him and slammed out of the house. Kutnyak followed Hayes outside and told him that the police had been there and that he should go to his cabin and stay there. (10) Finally, after shooting Hayes, Kutnyak walked up to Hayes' body and tapped the end of Hayes' gun with his fingers.

Viewing this evidence and the rules set forth in the above cases, we find that the record contains more than substantial evidence for a rational trier of fact to conclude beyond a reasonable doubt that the appellant deliberately provoked Hayes into a situation where he could shoot him.

The judgment of the trial court is affirmed.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____

_____
Justices

I concur in the result.

_____
Justice

Mr. Justice John C. Sheehy, Mr. Justice Frank B. Morrison, Jr., and Mr. Justice Daniel J. Shea dissent and will file written dissents later.

-24-

DISSENT OF MR. JUSTICE JOHN C. SHEEHY:

---------------------------------------------------------

No. 82-462

State v. Kutnyak

Dated:   July 16, 1984

FILED

JUL 17 1984

Ethel M. Harrison
CLERK OF SUPREME COURT
STATE OF MONTANA

Mr. Justice John C. Sheehy, dissenting:

My dissent in this case is based principally on the admission of testimony that Kutnyak had threatened two of his neighbors, although the District Court had earlier granted a motion in limine that would foreclose such testimony.

The State here violated the court's order by asking prohibited questions of Kutnyak, expecting, and getting answers to which it could then claim a right to impeach. In my book, that is trial by trickery.

Rule 404(b), M.R.Evid., disallows evidence of other crimes, wrongs or acts to prove the character of the defendant to show that he acted in conformity therewith. Here the State abused that rule. Any threats defendant may have made to others tend only to show his character, that is, that defendant was a combative or non-peaceful man. Under Rule 404(b), that evidence is not relevant.

The State and many District Courts evince a tendency to allow the jury to review the whole of a defendant's life to look for a particle that supports conviction. A different view of a trial should prevail, one confined to the crime charged, and the facts and circumstances connected to it. Extrinsic evidence of other acts to prove intent or character should never be allowed unless relevant, unambiguous, and having a logical nexus to the crime charged. Cohn v. Papke (9th cir. 1981), 655 F.2d 191; U.S. Dothard (11th cir. 1982), 666 F.2d 498.

_____
John C. Sheehy
Justice

- 25 -