No. 94-589

IN THE SUPREME COURT OF THE STATE OF MONTANA

1995

THE STATE OF MONTANA,

      Plaintiff and Respondent,

  v.

BRUCE HOLTE HAGEN,

      Defendant and Appellant.

**FILED**

OCT17 1995

*Ed Smith*

CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:  District Court of the Twentieth Judicial District,
In and for the County of Sanders,
The Honorable C. B. McNeil, Judge presiding.

COUNSEL OF RECORD:

      For Appellant:

        Stephen J. Nardi, Sherlock & Nardi, Kalispell,
Montana

      For Respondent:

        Honorable Joseph P. Mazurek, Attorney General;
Kathy Seeley, Assistant Attorney General, Helena,
Montana

        Robert Slomski, County Attorney, Thompson Falls,
Montana

Submitted on Briefs:  September 7, 1995

Decided:  October 17, 1995

Filed:

Clerk

Chief Justice J. A. Turnage delivered the Opinion of the Court.

Bruce Hagen was convicted by a jury in the Twentieth Judicial District Court, Sanders County, of deliberate homicide in violation of § 45-5-102, MCA, and aggravated assault in violation of § 45-5-202, MCA. Hagen appeals the decision of the District Court denying his proposed jury instruction on justifiable use of force in defense of an occupied structure. He also appeals on the grounds of ineffective assistance of counsel. We affirm.

Hagen raises the following issues on appeal:

1. Did the District Court err in refusing Bruce Hagen's proposed jury instruction on the justifiable use of force in defense of an occupied structure?

2. Was Bruce Hagen denied effective assistance of counsel?

Bruce Hagen is a fifty-eight-year-old retired federal government employee. Bruce and his wife, Gabby, lived in Sanders County, Montana, on Highway 200 between Plains and Thompson Falls. The Hagen residence is a mobile home with a log structure addition. Bruce and Gabby lived on Bruce's government pension.

In late September 1993, a forest fire burned in the vicinity of the Hagen residence. The fire burned within approximately thirty feet of the Hagens' home before it was stopped. Throughout the end of September and beginning of October, United States Forest Service personnel as well as private firefighters were in the area surrounding the Hagen residence extinguishing the fire.

Bruce received his pension checks the first of each month. On October 1, 1993, Bruce went to Krazie Ernies, a sporting good store

2

and pawn shop in Thompson Falls, and retrieved his .12 gauge shotgun he had pawned there. When he returned home, Bruce, Gabby, and Steve Jennette, an acquaintance living in the Hagens' camper trailer parked near their residence, began drinking. They drank throughout the afternoon. At approximately 2:00 p.m., Bruce and Steve began shooting the shotgun into a woodpile near the Hagen residence.

Officer Keith Danhoff of the Montana Highway Patrol was parked at the It Shop located directly across Highway 200 from the Hagen residence. Officer Danhoff heard the shots and drove up to the Hagen residence. He advised Bruce that he should not shoot the shotgun because firefighters and Forest Service personnel were still in the area. Officer Danhoff testified that Bruce became agitated and argumentative. Officer Danhoff returned to the It Shop where he heard one more shot come from the Hagen residence. Officer Danhoff waited approximately twenty minutes and heard no more shots.

Between 5:00 and 6:00 p.m., Gabby stated that she wanted to go into town to buy tobacco and continue drinking. Bruce did not want to drive to town because he had been drinking and he did not like to drive at night. Bruce and Gabby argued over whether she should go to town. Ultimately, Bruce gave his truck keys to Steve Jennette and Steve and Gabby went to town. Bruce remained at the Hagen residence.

At approximately 5:30 p.m., Sanders County Sheriff Sammy Tomas went to the Hagen residence to investigate the gunshots reported

3

earlier in the afternoon. When Sheriff Tomas approached the house he observed that the front door was open with only the screen door being closed. Sheriff Tomas observed Bruce lying on the couch in the living room. Sheriff Tomas knocked on the screen door and yelled at Bruce, but was unable to wake him. Sheriff Tomas testified that he assumed Bruce was passed out and left the Hagen residence.

Gabby and Steve drove to town in Bruce's truck. Gabby bought tobacco, and she and Steve proceeded to Dick's Club, a local tavern, to drink. They stayed at Dick's Club for several hours and consumed several drinks. Gabby and Steve left Dick's Club and drove toward the Town Pump Casino. On the way to the Town Pump Casino, Gabby and Steve experienced mechanical problems with Bruce's truck. Gabby and Steve abandoned the truck at the Town Pump Casino and went inside to look for a ride home.

Gabby and Steve ran into acquaintances Jim Enger and his common-law wife, Alice Goodrich, at the Town Pump Casino. Jim and Alice, like Gabby and Steve, had been drinking and were intoxicated. Gabby explained to Jim and Alice that she and Steve were having vehicle problems. Jim and Alice called their friend, Reece Cobeen, at his home, and Reece agreed to come to the Town Pump Casino and give Gabby and Steve a ride home. Reece testified that he had not been drinking.

Reece drove a compact pickup truck; therefore, Steve and Jim rode in the back while Reece, Gabby and Alice rode in the cab.

They arrived at the Hagen residence at approximately 1:00 a.m. on October 2, 1993.

When the party arrived at the Hagen residence, Gabby invited everyone into the house. Steve and Reece were unloading Steve's belongings from Reece's truck and hauling them to the camper trailer located near the Hagens' house. Gabby and Jim proceeded up the steps and onto the porch of the house. Gabby tried to open the door but was unable to do so. The door did not have a lock; instead, the Hagens customarily wedged a board between the door handle and the floor from the inside of the house. This barred the door closed and prevented it from being opened from the outside.

Gabby began knocking on the door and yelling for her husband, who did not respond. Gabby asked Jim to help her wake Bruce. Jim began kicking on the door and yelling for Bruce. Jim testified that he and Gabby banged on the door and yelled for approximately five minutes. Reece Cobeen testified that while Jim and Gabby were banging on the door, he and Steve finished moving Steve's belongings into the camper and then went and stood near the bottom of the stairs. The witnesses' versions of exactly what happened from this point vary slightly.

Jim testified that the door suddenly opened, and he entered the Hagen residence. He stated that Bruce answered the door carrying his .12 gauge shotgun. He testified that soon after entering the residence, Bruce struck him twice with the shotgun. Jim stated that he did not fall to the ground, but was knocked away from Bruce and was bent over toward the floor. He claims that

5

Bruce then stated, "Jim get out or I'm going to kill you." Jim testified that he turned and was heading for the door when he heard Bruce pump the shotgun lever. Jim heard the shotgun fire. Jim was struck in the left arm and left side of the body. He fell to the floor and remembered nothing else from the remainder of the incident.

Gabby testified that the door suddenly opened and her husband pulled or yanked Jim into the Hagen residence. She testified that the two men struggled. She claims that she then walked into the house and past Jim and Bruce. She proceeded to the rear of the house. While in the rear of the house, out of view of her husband and the others, she heard a shot or shots. She remained in the rear of the residence until the incident was over and then exited the residence through the back door.

Reece testified that he was standing near the foot of the stairs leading up to the front porch of the Hagen residence. He claimed that when the door opened, Jim, Gabby and Alice walked into the residence. He testified that as soon as they entered the residence, Bruce escorted Gabby back outside and told her to "just go." Bruce then returned inside the residence where Jim and Alice were. Reece then heard a loud crashing noise, like someone or something had fallen to the floor. He then claimed he heard Bruce say, "Jim, don't fuck with me or I will kill you." He then claimed to have heard two gunshots coming from inside the residence.

Bruce testified that he was awakened by a loud, impatient banging on his front door. As he walked to the door, he picked up

his loaded shotgun. He did not specifically recall removing the board which held the door shut, but admitted he must have done so to open the door. Bruce claimed that when he opened the door he was immediately encountered by a man on his front porch. He claimed he did not know that it was Jim at the time of the altercation. Bruce testified that he and Jim wrestled for the gun. Bruce claims that he struck Jim in the head with the gun, knocking him down. Bruce then testified that Jim made a move toward him. Bruce claimed that as Jim came toward him, he pumped the lever of the shotgun to transfer a shell from the magazine into the chamber and the gun fired. He claimed he then turned toward the door and saw a pair of legs rushing toward him. He pumped another shell into the chamber and fired. He then pumped the final shell into the chamber and fired again. He claimed he did not know who he was shooting and testified that he would have shot anyone at that time.

Of the three shots fired, the first shot hit Jim. Another shot struck the rails on the back of the porch. The other shot struck Alice in the midsection, causing massive injuries. Alice was dead when medical personnel arrived.

Alan Boehm, the State Crime Lab's firearms and tool mark examiner, examined and tested the shotgun and testified that even if the trigger was depressed while the pump action was cocked, this particular shotgun would not fire. Boehm testified that the trigger would have to be released and then depressed again for the shotgun to fire. Boehm also testified that both Jim and Alice were shot from a distance of less than eight feet.

On October 22, 1993, Bruce was charged by information with one count of deliberate homicide and one count of aggravated assault in the Twentieth Judicial District Court, Sanders County. Bruce pleaded not guilty. Following the May 9 through 12, 1994 jury trial, Bruce was found guilty of both charges. He was sentenced to life imprisonment for deliberate homicide plus ten years for the use of a dangerous weapon. He was further sentenced to twenty years for aggravated assault plus ten years for the use of a dangerous weapon. The sentences are to run consecutively.

## Issue 1

Did the District Court err in refusing Bruce's proposed jury instruction on justifiable use of force in defense of an occupied structure?

At trial Bruce admitted shooting Jim and Alice, but claimed the shooting was justified in defense of himself and his property. Bruce sought jury instructions on justifiable use of force in defense of a person and justifiable use of force in defense of an occupied structure. The District Court gave the self-defense instruction, but refused to give an instruction on defense of an occupied structure. While settling the instructions, the State argued and the court agreed that defense of an occupied structure is only a defense to an unlawful entry. The court agreed that because Gabby invited Jim and Alice into the Hagens' home, Jim and Alice's entry into the residence was not unlawful. A district court must only instruct the jury on those theories and issues

8

which are supported by evidence presented at trial.  state v. Popescu (1989), 237 Mont. 493, 495, 774 P.2d 395, 396.

Bruce argues on appeal that the District Court misinterpreted Montana's statute on justifiable use of force in defense of an occupied structure.  He claims that the entry need not be actually unlawful; rather, the defendant must reasonably believe that the entry was unlawful based on the appearances presented to him.

The defense of justifiable use of force in defense of an occupied structure is set forth at § 45-3-103, MCA, which states:

> A person is justified in the use of force or threat to use force against another when and to the extent that he reasonably believes that such conduct is necessary to prevent or terminate such other's unlawful entry into or attack upon an occupied structure.  However, he is justified in the use of force likely to cause death or serious bodily harm only if:
> (1)  the entry is made or attempted in violent, riotous, or tumultuous manner and he reasonably believes that such force is necessary to prevent an assault upon or offer of personal violence to him or another then in the occupied structure; or
> (2)  he reasonably believes that such force is necessary to prevent the commission of a forcible felony in the occupied structure.

Bruce argues that § 45-3-103, MCA, only requires his reasonable belief that Jim and Alice had unlawfully entered his residence for him to be entitled to an instruction on defense of an occupied structure.  We disagree.

Section 45-3-103, MCA, states that an individual is justified in using force "when and to the extent that he reasonably believes that such conduct is necessary to prevent or terminate such other's unlawful entry."  (Emphasis added.)  This Court has consistently refused to apply the defense of an occupied structure statute in

9

cases in which the initial entry into the structure was in fact lawful.

In State v. Sorenson (1980), 190 Mont. 155, 619 P.2d 1185, a bartender shot two bar patrons after an argument. This Court determined that, while the bartender may have wanted the patrons to leave the premises, their initial entrance into the bar was not unlawful. In affirming the trial court's denial of the defendant's proposed jury instruction on defense of an occupied structure, this Court stated:

> [Section 45-3-103, MCA] is derived from Illinois which has substantially the same statute. [Citation omitted. ]
>
> Before the statute is applicable, Illinois case law requires that the entry **must** be unlawful; hence, the defendant **may** not assert justification where the victims enter upon the premises lawfully but subsequently engages in unlawful conduct for which the occupant of the dwelling seeks to expel the **victim** [Citations omitted.]
>
> By its terms, this section only applies to efforts of a defendant to prevent or terminate an unlawful entry into occupied premises. It has no application to a lawful entry into premises. [Emphasis added.]

Sorenson, 619 P.2d at 1193-94. We have reiterated this position in State v. Beach (1991), 247 Mont. 147, 150, 805 P.2d 564, 566, determining that a defendant was not entitled to a defense of an occupied structure instruction when the entry which precipitated the incident was in fact lawful.

We find no merit in Bruce's argument that, even if the entry was in fact lawful, he is entitled to an instruction on defense of an occupied structure if he reasonably believed that the entry was

10

unlawful. As discussed above, this Court has consistently held that to assert the defense of justifiable use of force in defense of an occupied structure, the entry into the structure must in fact be unlawful. We refuse to expand the defense beyond what has previously been recognized. Thus, a defendant may not reasonably mistake a lawful entry for an unlawful entry and avail himself of the defense provided for in § 45-3-103, MCA.

Bruce failed to present any evidence establishing that the initial entry by Jim or Alice was unlawful. A review of the record reveals the following facts: Gabby invited Jim and Alice into the Hagen residence. Gabby knocked on the door in an attempt to awaken Bruce. Gabby requested Jim's assistance in knocking on the door. Bruce removed the wooden brace which held the door closed and opened the door. Jim either walked in through the opened door or was pulled into the residence by Bruce. Based on the facts presented at trial, Bruce failed to set forth any set of circumstances under which Jim's or Alice's entry into the Hagen residence could be found to be unlawful. As discussed above, we conclude that an unlawful entry is a prerequisite to asserting the defense of justifiable use of force in defense of an occupied structure. Bruce therefore was not entitled to an instruction on justifiable use of force in defense of an occupied structure.

## Issue 2

Was Bruce denied effective assistance of counsel?

Bruce argues that he was denied effective assistance of counsel and therefore is entitled to a new trial. In considering

11

ineffective assistance of counsel claims, this Court has adopted the two-pronged test set forth by the United States Supreme Court in Strickland v. Washington (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674.

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

State v. Denny (1993), 262 Mont. 248, 251-52, 865 P.2d 226, 228 (quoting Strickland, 466 U.S. at 687). Bruce presents several allegations of ineffective assistance of counsel which we will address in turn

> A. Defense counsel failed to object to the prosecution's reference during jury voir dire to a witness who was not called at trial.

Bruce argues that he was denied effective assistance of counsel when his trial counsel failed to object to a line of questions during voir dire which referred to Steve Jennette, an individual who was at the Hagen residence the morning of the shootings but who was not called to testify. Following the selection of the twelve jurors, voir dire continued on the selection of alternate jurors. One member of the jury pool was Michael Wakefield, a pastor at a local church. During questioning of this prospective alternate juror, Wakefield stated that he knew Steve Jennette and had counseled Jennette after the shooting

12

incident. Wakefield stated that he had received "first hand" information concerning the shooting from Jennette during these counseling sessions. This line of questioning occurred in the presence of the jurors already selected. Defense counsel did not object during the questioning of Wakefield.

In State v. McMahon (Mont. 1995), 894 P.2d 313, 51 St.Rep. 353, we held that the district court erred in failing to grant the defendant's motion for a mistrial when prospective jurors were allowed to comment on the defendant's character during voir dire. However, McMahon is clearly distinguishable from this case. In McMahon, several jurors made substantial comments concerning what they perceived as the defendant's poor character, in the presence of the entire jury panel. McMahon, 894 P.2d at 315-16.

In this case, no evidence concerning the substance of Jennette's conversations with Wakefield was presented. In questioning Wakefield, the prosecution elicited information that Wakefield in fact knew Jennette and had discussed the shooting incident with him. No facts pertaining to the incident were disclosed. While it may have been reasonable for defense counsel to object to the line of questioning or request an in camera inspection of Wakefield, such actions by defense counsel were not mandated by the line of questioning. See Abernathy v. Eline Oil Fields Services, Inc. (1982), 200 Mont. 205, 650 P.2d 772.

We conclude that defense counsel's performance was not deficient because of his failure to object or request an admonish-

13

ment or an <u>in camera</u> hearing.  Therefore the first prong of the <u>Strickland</u> test is not satisfied.

> B.    Defense counsel failed to request a jury instruction on Bruce's right to rely on appearances when asserting the defense of justifiable use of force.

While the defense requested and received an instruction on justifiable use of force, Bruce argues on appeal that his counsel should have requested an additional instruction concerning his right to rely on appearances.  Bruce claims that the jury should have been instructed that he had the right to reasonably rely on the appearances presented to him at the time of the incident regardless of the actual danger.  He maintains that trial counsel's failure to request such a jury instruction constitutes ineffective assistance of counsel

Jury instructions are generally considered to be within the province of an attorney's trial tactics or strategies.  State v. Bradley (1993), 262 Mont. 194, 199, 864 P.2d 787, 790. In reviewing a counsel's performance, we will not second guess a calculated trial tactic.  <u>Bradley,</u> 864 P.2d at 790.  Further, while each party is entitled to instructions supported by the evidence, jurors need not be instructed on every nuance of an issue. In State v. Graves (1981), 191 Mont. 81, 622 P.2d 203, this Court stated:

> In examining self-defense instructions this Court has repeatedly stated several principles which govern the review of challenged instructions.  The instructions must be viewed as a whole to determine if they have limited the defense from fairly presenting his theory of defense. <u>The District Court need not give repetitious instructions nor instruct on every nuance of a theory of defense.</u>
> [Emphasis added. ]

14

<u>Graves,</u> 622 P.2d at 210. A review of the instructions in the present case reveals that the jury was sufficiently instructed on the defense of justifiable use of force

The following instructions were given to the jury following trial--Instruction No. 19 reads:

A person is justified in the use of force or threat to use force when and to the extent that he reasonably believes that such conduct is necessary to defend himself against the imminent use of unlawful force.

However, a person is justified in the use of force which is intended or likely to cause death or serious bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or serious bodily harm to himself.

Instruction No. 21 reads in part:

You are to consider the following requirements of the law in determining whether the use of force claimed by defendant was justified:
(1) The defendant must not be the aggressor;

(2) The danger of harm to the defendant must be a present one and not made by a person without the present ability to carry out the threat;

(3) The force threatened against the defendant must be unlawful;

(4) <u>The defendant must actually believe that the danger exists,</u> that is, use of force by him is necessary to avert the danger and that the kind and amount of force which defendant uses is necessary;

(5) <u>The defendant's belief, in each of the aspects described, is reasonable even if it is mistaken.</u>

You are further advised that even if you determine that use of force by defendant was not justified, the state still has the duty to prove each of the elements of the crime charged beyond a reasonable doubt. [Emphasis added.]

This Court has previously determined that self-defense instructions such as these, which are derived from the statutory language, are

15

sufficient to convey the fact that the defendant may rely on the appearances present at the time of the incident. State v. Reiner (1978), 179 Mont. 239, 251, 587 P.2d 950, 957.

We conclude that the jury was sufficiently instructed on the defense of justifiable use of force. We therefore hold that Bruce's defense counsel's performance was not deficient and thus the first prong of the <u>Strickland</u> test has not been satisfied.

> C. Defense counsel failed to request an instruction on negligent homicide as a lesser offense.

Bruce argues that the evidence supported offering an instruction on the lesser offense of negligent homicide. Bruce claims that his trial counsel's failure to request an instruction on negligent homicide amounts to ineffective assistance of counsel.

As previously stated, offering jury instructions is generally considered to be a discretionary trial tactic. <u>Bradley,</u> 864 P.2d at 790. At trial, the jury was instructed on the elements of deliberate homicide and mitigated deliberate homicide as well as the defense of justifiable use of force. Bruce's trial counsel did not request instructions on negligent homicide.

Under the circumstances, not requesting an instruction on negligent homicide can easily be viewed **as a legitimate trial tactic.** Arguing negligent homicide at trial may have jeopardized defense counsel's contention that Bruce acted knowingly in self-defense. While not deciding that a negligent homicide instruction is inconsistent with the defendant's case, it was a reasonable tactic to avoid arguing negligent homicide in fear of undermining Bruce's self-defense claim.

Because we conclude that defense counsel's failure to request instructions on negligent homicide falls under the realm of counsel's trial tactics, we hold that defense counsel's performance was not deficient and thus the first prong of the <u>Strickland</u> test is not satisfied.

> D. Defense counsel failed to call a witness whose **testimony** tended to impeach the credibility and accuracy of Reece Cobeen's testimony.

Bruce argues that a witness who spoke with Reece Cobeen after the shooting incident was available and willing to testify. This witness would presumably testify that Cobeen told him that he was standing at his pickup, not at the bottom of the stairs, when the shooting occurred. Bruce maintains that this witness would have discredited Cobeen's testimony and thus would have raised a reasonable doubt in the minds of the jury.

Defense counsel admits that he negligently failed to get the witness on the stand. The State concedes that the failure of defense counsel to call this witness rendered counsel's performance deficient, thus satisfying the first prong of the <u>Strickland</u> test. However, the **State** maintains that Bruce has failed to establish that his counsel's deficient performance was so prejudicial that he was denied a fair trial.

For the purpose of this appeal, we will assume without deciding that defense counsel's failure to call a relevant witness resulted in deficient representation. We therefore proceed to the second prong of the <u>Strickland</u> test which addresses, "whether a reasonable probability exists that but for counsel's deficient

performance, the trial's outcome would have been different." State v. Sheppard (Mont. 1995), 890 P.2d 754, 757, 52 St.Rep. 106, 108.

Cobeen's location in relationship to the front porch, while relevant to this case, is not dispositive. A review of the record reveals, absent Cobeen's testimony in its entirety, substantial evidence to support the jury's verdict.

Bruce admits shooting Jim and Alice. Bruce's wife Gabby testified that Jim and Alice were her guests and that she had invited them into the Hagen residence. Jim and Alice were both unarmed at the time of the incident. Jim testified that Bruce called his name prior to shooting him. Bruce testified that after shooting Jim, he turned and shot Alice without regard at whom he was firing. The testimony of the defendant Bruce Hagen, his wife Gabby, and the victim Jim Enger established substantial evidence to uphold the verdicts of deliberate homicide and aggravated assault.

We conclude that no reasonable probability exists that but for defense counsel's deficient performance, the result of the trial would have been different. Based on the discussion above, we hold that Bruce was not denied effective assistance of counsel.

We affirm the decision of the District Court.


J.A. Turnage
_____
Chief Justice

18

We concur:

_____

_____

_____

_____
              Justices

19