DA 10-0291

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2011 MT 278

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

LARRY B. DANIELS,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Twenty-Second Judicial District,
In and For the County of Carbon, Cause No. DC 09-024
Honorable Blair Jones, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

      Colin M. Stephens; Smith & Stephens, P.C.; Missoula, Montana

      For Appellee:

      Steve Bullock, Montana Attorney General; Jonathan M. Krauss, Assistant
Attorney General, Helena, Montana

      Dan Guzynski, Assistant Attorney General, Special Deputy County
Attorney for Carbon County, Helena, Montana

      Alex Nixon, Carbon County Attorney, Red Lodge, Montana

Submitted on Briefs:  June 22, 2011

Decided:  November 8, 2011

Filed:

_____
Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 Defendant Larry B. Daniels (Daniels) appeals from the conviction and judgment for deliberate homicide entered following jury trial in the Twenty-Second Judicial District Court, Carbon County. In defense, Daniels asserted justifiable use of force. We affirm and restate the issues on appeal as follows:

¶2 *1. Did the District Court err in its rulings regarding the admissibility of character evidence of the victim in violation of the Rules of Evidence and Daniels' constitutional rights?*

¶3 *2. Did the District Court err by refusing Daniels' proposed jury instructions on justifiable use of force in defense of an occupied structure and burglary as a forcible felony?*

## FACTUAL AND PROCEDURAL BACKGROUND

¶4 In April 2009, the Daniels family rented a ten-acre property in Fromberg, Montana. Daniels, age 66, Buddy (Daniels' adult son, age 43), Logan (Daniels' son, age 14), and Hagen (Buddy's son, age 13), lived together on the property. Daniels and Logan had recently moved to Montana from California, and the property was rented by Daniels so that the Daniels family could live together. Two residential structures were on the property, including a north house consisting of an apartment and attached shop, and the main house located to the south. Buddy, Logan, and Hagen lived in the main house, while Daniels resided in the apartment in the north house.

2

¶5 Daniels and Buddy had plans to develop the property, and on the morning of May 21, 2009, they went to Billings to purchase lumber to build corrals. Daniels and Buddy drank beer while driving home, stopping to buy food and supplies for Logan and Hagen. They stopped at a bar and drank beer and liquor with friends until around 8:00 p.m. According to the bartender, everyone "seemed to be getting along great."

¶6 Later, Daniels, Buddy, Logan and Hagen gathered at the main house for dinner. Logan testified that Daniels and Buddy were intoxicated. An argument ensued during dinner over Daniels incorrectly remembering Logan's birthday and not being "a good grandpa" to Hagen. The argument escalated, with Buddy asking Daniels to leave the main house, and Daniels refusing. Buddy broke two chairs and Daniels threw a beer at Buddy. Buddy then struck Daniels and wrestled him to the ground, pinning him there and telling him to leave. Buddy then rolled or drug Daniels down the stairs. Daniels testified he did not remember being struck, only that he ended up at the bottom of the stairs. The argument continued as Daniels and Buddy moved into the mud room. Hagen testified "it kind of toned down a little bit" and that neither person seemed to be hurt. Daniels headed to his house, with Buddy following. Hagen testified that he and Logan decided to "separate" Daniels and Buddy, and the boys started to go towards Daniels' house. Daniels went into his house and was the only witness to the events that occurred inside the home.

¶7 Daniels testified that he "went straight to the refrigerator and grabbed a beer," and went upstairs. He said he was quite upset, took a .22 pistol out of a holster and sat on his

3

bed "thinking about shooting myself." Daniels testified he heard the front door open and Buddy's angry voice. Buddy came up the stairs and verbally challenged Daniels. Daniels testified that when Buddy came up the stairs, Daniels said, "No more. Go home. It's over. Go home. Get out of here." Daniels told police "[b]y that time I'm around on this side of my bed at my nightstand and my pistol lays right there. I picked up my pistol and I said Bud, just leave and leave me alone. He said fuck you and your pistol. I'll shove that mother fucker up your ass and he come toward me, pop, pop." Daniels testified Buddy "straight-arm[ed] me in the chest," and the pistol went in the air and he pulled the trigger "to protect myself." Daniels told police that he fired three shots ten feet from Buddy. He told police his intent was to "[g]et away from him" and "to stop him," and that "[a]ny time you pick up a gun and you pop a cap, your intent is to kill."

¶8 After the shooting, Daniels went downstairs. Logan and Hagen came through the doorway and Daniels told them to leave. Logan and Hagen testified that Daniels said that he had just shot and killed Buddy. Daniels called 911, telling the dispatcher: "He's wantin' to beat me up all the time and he owes me a ton of money and arguin' about this and one thing another. He ripped my shirt off of me and he shoved me down the stairs one thing another and I ... I come over to my little house and he followed me up here gonna kick my ass one thing another and I said leave me alone. I can't out .. I can't beat you. I'm too old. I can't whip him anymore. I picked up my gun, he said oh fuck you. What ya gonna do with that gun you know and blah, blah and I said I ... I ain't gonna do it anymore. I'm tired of it. Then I pulled the trigger. I'm guilty 100%." Daniels

4

testified he remembered telling the 911 dispatcher he was "one hundred percent guilty," and meant that "I had shot my son. I knew that I had done this. I was not looking for any kind of defense at the time. I was not looking for justification. I was just -- yes, I did it." A trooper who arrived at the scene testified that Daniels' demeanor struck him as almost jovial and upbeat, and Daniels "asked if [the trooper] could get him a beer because it might be the last one that he would ever have." Six hours after the shooting Daniels' blood alcohol content was 0.08. Daniels was arrested at the scene.

¶9      Daniels had an abrasion on his left elbow, and no other injuries. Buddy had two gunshot wounds, one to the back of his head at the base of his skull—which the forensic pathologist/medical examiner, Dr. Thomas Bennett, believed was sustained first—and a second gunshot wound to the middle of his back. The third bullet went into the ceiling. The gunshot to the back of Buddy's head struck and fractured the base of the skull. Dr. Bennett testified that the shot to Buddy's skull probably took place when he was upright, and it would have rendered Buddy immediately unconscious and caused him to fall directly to the ground. Dr. Bennett believed Buddy was still alive at that point and his heart would still have been beating. Dr. Bennett opined the second shot to the middle of his back occurred when Buddy was on the ground. According to Dr. Bennett, this shot broke two ribs and perforated Buddy's lung, causing his chest cavity to fill with blood. Dr. Bennett believed both shots were fired very close in time. Dr. Bennett believed the first shot was fired from a distance of "at least four to five feet or more," and the second

5

shot was fired from a closer distance of approximately a foot and a half away. Injuries sustained from the two gunshot wounds caused Buddy's death.

¶10 The State filed an Information charging Daniels with deliberate homicide in violation of § 45-5-102, MCA (2007).[1] The State later amended the Information to alternatively charge mitigated deliberate homicide in violation of § 45-5-103, MCA. Daniels pled not guilty to the charges and filed notice of his intent to rely on the affirmative defense of justifiable use of force. The State filed a motion in limine to prohibit Daniels from referencing testimony regarding Buddy's alleged character for violence until a proper foundation had been laid by Daniels, and Daniels sought an order excluding "any argument by the prosecution that would tend to shift the burden of proof." (Emphasis omitted.) The District Court entered preliminary rulings and deferred final rulings until trial. In January 2010, a six-day jury trial was conducted, during which Daniels testified. The jury returned a guilty verdict on the charge of deliberate homicide. The District Court sentenced Daniels to 60 years in Montana State Prison, with a condition that he be ineligible for parole for 20 years. Daniels appeals. Additional facts as necessary will be discussed herein.

**STANDARD OF REVIEW**

¶11 A district court has broad discretion when determining the relevance and admissibility of evidence. *State v. Derbyshire*, 2009 MT 27, ¶ 19, 349 Mont. 114, 201

---

[1] Because Buddy's death occurred in May of 2009, the 2007 MCA was in effect, except for the justifiable use of force amendments enacted within House Bill (HB) 228, which went into effect on April 27, 2009. Laws of Montana, 2009, ch. 332, § 11, at 2275. All subsequent references to the MCA will be to the 2007 version, unless otherwise indicated.

P.3d 811. Generally, we review evidentiary rulings for an abuse of discretion. *State v. Dist. Ct. of the Eighteenth Jud. Dist.*, 2010 MT 263, ¶ 31, 358 Mont. 325, 246 P.3d 415. A district court abuses its discretion if it "acts arbitrarily without the employment of conscientious judgment or exceeds the bounds of reason, resulting in substantial injustice." *Derbyshire*, ¶ 19. "In exercising its discretion, however, the trial court is bound by the Rules of Evidence or applicable statutes. Thus, to the extent the court's ruling is based on an interpretation of an evidentiary rule or statute, our review is de novo." *Derbyshire*, ¶ 19; *see also Dist. Ct. of the Eighteenth Jud. Dist.*, ¶ 31. Our review is plenary for questions regarding constitutional law. *State v. Jackson*, 2009 MT 427, ¶ 50, 354 Mont. 63, 221 P.3d 1213.

## DISCUSSION

¶12 ***1. Did the District Court err in its rulings regarding the admissibility of character evidence of the victim in violation of the Rules of Evidence and Daniels' constitutional rights?***

### A. 2009 Legislative Changes

¶13 The central theme of Daniels' arguments is that the District Court erred by making rulings in violation of legislation enacted by the 2009 Legislature. HB 228 proposed an act "preserving and clarifying laws relating to the right of self-defense and the right to bear arms." Laws of Montana, 2009, ch. 332, at 2271 (emphasis omitted). Under prior law, the State bore the burden of proving the elements of the charged offense beyond a reasonable doubt, but it did not need to prove "the absence of justification." *State v.*

7

*Henson*, 2010 MT 136, ¶ 33, 356 Mont. 458, 235 P.3d 1274 (citing *State v. Longstreth*, 1999 MT 204, ¶ 22, 295 Mont. 457, 984 P.2d 157; additional citation omitted). In *Longstreth*, we explained that "as an affirmative defense, justifiable use of force requires the defendant to produce sufficient evidence on the issue to raise a reasonable doubt of his guilt and that the State's burden is to prove beyond a reasonable doubt the elements of the offense charged, *which does not include the absence of justification*." *Longstreth*, ¶ 22 (emphasis added).

¶14    The sponsor of HB 228, Representative Kerns, indicated to the House Judiciary Committee that the bill "shifts the burden to the prosecutor to prove . . . the absence of justification" in self-defense claims. Mont. H. Comm. on Jud., *Hearing on H. Bill 228*, 61st Legis., Reg. Sess., (Jan. 22, 2009). Committee discussion on HB 228 expressly referred to *Longstreth*. Mont. H. Comm. on Jud., *Hearing on H. Bill 228*, 61st Legis., Reg. Sess., Exhibit 3, at 1-2 (Jan. 22, 2009) (noting HB 228's provision on the burden of proof for justifiable use of force "is important and needed to clarify law in Montana resulting from the 1999 *Longstreth* opinion by the Montana Supreme Court"). Rep. Kerns explained that the "meat of the bill" was that "you are innocent until proven guilty in terms of self-defense. That the State must prove an absence of justification beyond a reasonable doubt with respect to self-defense claims. That's the foundation of our judicial system in this nation, and we're just specifying that it applies to self-defense claims as it does [to] every other aspect of the law." Mont. Sen. Comm. on Jud., *Hearing*

*on H. Bill 228*, 61st Legis., Reg. Sess., (Mar. 17, 2009). HB 228 included a provision which is now codified as § 46-16-131, MCA (2009):

> **Justifiable use of force – burden of proof.** In a criminal trial, when the defendant has offered evidence of justifiable use of force, the state has the burden of proving beyond a reasonable doubt that the defendant's actions were not justified.

*See also* Laws of Montana, 2009, ch. 332, § 9, at 2275. The enactment of HB 228 effectively abrogated *Longstreth*, *Henson* and other cases to the extent they held that the burden of proof for the defense of justifiable use of force (JUOF) was on the defendant.[2]

¶15    Daniels further argues that the passage of HB 228 "reversed the long-held rule in Montana that justifiable use of force" is an affirmative defense, apparently because defendants have historically been required to prove affirmative defenses. *See State v. Gratzer*, 209 Mont. 308, 318, 682 P.2d 141, 146 (1984). However, this argument overstates the effect of the legislation. Section 45-3-115, MCA, unchanged by HB 228, continues to provide that JUOF is an affirmative defense, which we have defined as "one that admits the doing of the act charged, but seeks to justify, excuse or mitigate it." *State v. Nicholls*, 200 Mont. 144, 150, 649 P.2d 1346, 1350 (1982). A defendant is still required to provide written notice to the prosecutor of his intention to rely upon the defense of JUOF. Section 46-15-323(2), MCA. And, while the Legislature provided that the burden of proof can ultimately be shifted to the State, it placed the initial burden of evidence production upon the defendant. Under § 46-16-131, MCA (2009), the

---

[2] *See e.g. State v. Matz*, 2006 MT 348, 335 Mont. 201, 150 P.3d 367; *State v. Daniels*, 210 Mont. 1, 682 P.2d 173 (1984); *State v. Kutnyak*, 211 Mont. 155, 685 P.2d 901 (1984).

defendant has the initial burden to "offer[] evidence of justifiable use of force" before the burden of proof is shifted to the State. If the defendant offers no evidence, then he fails to satisfy his initial burden and the defense fails. *See* § 26-1-401, MCA ("The initial burden of producing evidence as to a particular fact is on the party who would be defeated if no evidence were given on either side. Thereafter, the burden of producing evidence is on the party who would suffer a finding against him in the absence of further evidence."). Accordingly, though the ultimate burden of proof can be shifted to the State, JUOF still operates as an affirmative defense.

¶16 We also disagree with Daniels' implication that by providing pre-trial notice of his intention to rely on JUOF as a defense, he satisfied his burden under § 46-16-131, MCA (2009), to "offer[] evidence," and thereby shifted the burden of proof to the State. Notice does not place the defense of JUOF at issue during the trial. *City of Red Lodge v. Nelson*, 1999 MT 246, ¶ 13, 296 Mont. 190, 989 P.2d 300; *State v. Logan*, 156 Mont. 48, 65, 473 P.2d 833, 842 (1970) (the notice of self-defense served by defendant on the State pre-trial is immaterial and does not place the matter into issue during trial; defendant is not bound to rely on this defense at trial, notwithstanding service on the State).[3]

### B. The District Court's evidentiary rulings

¶17 The thrust of Daniels' overlapping arguments is that the District Court erred in its rulings regarding the foundation required for the introduction of character evidence about

---

[3] In the District Court, the parties agreed that sufficient evidence was offered by Daniels to raise JUOF as a defense, and the jury was instructed accordingly. Therefore, we take no position on the quantum of evidence required under § 46-16-131, MCA (2009), to shift the burden of proof to the State, as that issue is not before us.

Buddy. Before trial, the State filed a motion in limine requesting the court to "issue an order prohibiting the Defendant at trial from referencing or soliciting testimony regarding the victim's alleged character for violence, including specific acts of violence, until a proper foundation is laid by the Defendant . . . ." At hearing, the court noted the statement in *State v. Montgomery*, 2005 MT 120, ¶ 20, 327 Mont. 138, 112 P.3d 1014, that failure to establish the defendant's knowledge of the victim's violent past rendered certain character evidence of the victim "irrelevant and inadmissible." Defense counsel argued that "there are various ways for a defendant to establish his knowledge of the violent nature of the victim. It doesn't have to be through the defendant's testimony." The court responded it felt it was a "sticky wicket" in that "you're asking someone else to really comment on what only the individual himself can readily establish." The State added that "a distinction needs to be made at some point of reputation evidence and specific instances of violent behavior by the victim," stating that the State's concern was "the State's case being prejudiced by the introduction of specific acts."

¶18 Relying on *Montgomery*, the court made an initial ruling on the State's motion:

> [F]or evidence of the victim's character and propensity for violence to be admissible the evidence first must be related to the issue of the reasonableness of force used by the defendant. And at this point, the Court's assuming that based on the defendant's obvious indications that justifiable use of force is a defense in this case.
> Secondly, the defendant must establish his knowledge of the violent nature of the alleged victim in order for that evidence to be admissible.
> I will reserve how that must be established, but just for general guidance, it would seem that without the defendant's testimony in that regard, relative to what his understanding was, it may be difficult to show that. But I'm keeping an open mind.

11

And then finally, the defendant must show that this knowledge motivated his own level of force. . . .

So if the defendant fails to make that showing, the evidence is irrelevant and inadmissible.

During trial, prior to the State calling Hagen as a witness, Daniels indicated Hagen had knowledge of a previous act of violence by Buddy that Daniels wanted to inquire into on cross-examination. The court said it would disallow cross "until there's some foundation laid for that pursuant to Montgomery and other cases. I thought about this previously, but I think the defendant is going to have to testify." Citing *State v. Cartwright*, 200 Mont. 91, 650 P.2d 758 (1982) and *Logan*, the court concluded "I'm not going to allow it until that foundation is laid." However, during defense cross-examination, Hagen testified that Buddy had "[a] little bit" of a reputation for fighting, without objection from the State.

¶19 During Logan's testimony, the court sustained the State's objection to a defense question asking about Buddy's reputation "for being a fighter." In the chambers conference which followed, defense counsel indicated "I did not interpret your previous ruling to go to reputation," and the State argued "I believe that reputation for violence only comes in . . . once the defendant testifies and he says that he relied upon the defendant's reputation for violence and he acted upon that." The court responded "it seems to me to be the appropriate way to go." Thereafter, questioning resumed, but no reference was made to Buddy's reputation for violence.[4]

---

[4] At the close of the defense's case-in-chief, defense counsel indicated for the record "we had other witnesses that fell in that category and that would have been Logan Daniels." Thus, "we

12

¶20    Thereafter, Daniels took the stand, and defense counsel asked: "Do you know of any other instances in the past of Bud being violent to you?" The State objected and, at the ensuing chambers conference, the court stated that the State's objection would be sustained because the level of testimony so far was "insufficient foundation that what was going on in his mind was that he was recalling other specific instances of violence committed by this victim." Daniels' counsel then made an offer of proof of six instances of Buddy's past behavior he wished to admit. The court ruled that four of the six instances were more prejudicial than probative and would be excluded under M. R. Evid. 403.[5] The court also ruled that a 2007 Columbia Falls bar fight and a 2004 incident at a barbecue in Wyoming would be admissible upon the proper foundation.

¶21    However, when Daniels resumed testifying, he did not offer this foundation. Instead, counsel asked: "[I]n your decision to shoot Bud, did you take into consideration his propensity for violence?" Daniels answered "[y]es, I did." Defense counsel then asked if Buddy had a reputation for "being violent," "fighting," "a short fuse," and "holding grudges," to which Daniels answered "[y]es, he does." Defense counsel then asked:

> Now when you decided to shoot, you had just come from the main house; is that correct?
>
> [Daniels]:  Correct.

---

made the decision not to call other witnesses who would have gotten on the stand and who would have testified as to reputation."

[5] This ruling is not disputed on appeal.

[Defense counsel]: And so that was really what was on your mind, is that fair to say?

[Daniels]: The events of that evening, yes.

[Defense counsel]: So you had just gotten beat up; is that correct?

[Daniels]: Yes.

.   .   .

[Defense counsel]: Is it fair to say your main motivating force that night was what happened that night?

[Daniels]: Correct.

Immediately thereafter, the parties met with the court in chambers and the State argued that, after this testimony, the specific instances of Buddy's character for violence had no probative value and would only be prejudicial. Daniels agreed and indicated "we chose to go away from specific acts and go through that. We went through general reputation. That's what we did." The court confirmed that reputation evidence had been received "obviously without objection, as to propensity."

## C.   Analysis

### i.)   Rules of Evidence

¶22   Daniels challenges the District Court's ruling that he needed to testify in order to lay the foundation necessary for admission of Buddy's character evidence. He also contends the District Court abused its discretion by disallowing cross-examination of the

14

State's witnesses on Buddy's reputation and acts of violence, asserting the rulings were premised on case law which has been overruled by HB 228.[6]

¶23 While HB 228 provides for shifting of the burden of proof of JUOF, the Montana Rules of Evidence still apply and "govern all proceedings in all courts in the state of Montana . . . ." M. R. Evid. 101(a). *See also* § 46-16-201, MCA ("The Montana Rules of Evidence and the statutory rules of evidence in civil actions are applicable also to criminal actions, except as otherwise provided."). Generally, "[e]vidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion," M. R. Evid. 404(a), with an exception for "[e]vidence of a pertinent trait of character of the victim of the crime offered by an accused." M. R. Evid. 404(a)(2); *State v. Sattler*, 1998 MT 57, ¶ 43, 288 Mont. 79, 956 P.2d 54.[7] When character evidence is admissible, Rule 405 provides the methods of proving character. *Nelson*, ¶ 11. Rule 405 provides:

---

[6] The State asserts that the "only evidentiary issue before this Court is whether the district court erred in excluding prior specific instances of Buddy's violence . . . ." The State notes that testimony about Buddy's reputation for fighting was given without objection during Hagen and Daniels' testimony. However, reputation evidence was excluded during Logan's testimony, on the ground of insufficient foundation. Daniels focuses on the District Court's "one constant ruling," which he describes as "that there would be no evidence of Buddy's past acts *or reputation* absent proper foundation being laid via Larry's testimony." (Emphasis added.) Thus, we deem Daniels' arguments to encompass the exclusion of reputation evidence as well as prior specific acts of violence.

[7] Instead of utilizing Rule 404(a)(2), Daniels appears to argue on appeal that Buddy's character was admissible because it was "an essential element" of the JUOF defense, citing M. R. Evid. 404(c). Rule 404(c) states "[e]vidence of a person's character or a trait of character is admissible in cases in which character or a trait of character of a person is an essential element of a charge, claim, or defense." *See also* the first prong of M. R. Evid. 405(b). However, a "victim's character for violence is not an 'essential element' of the defense of justifiable force." *Nelson*,

15

(a) Reputation or opinion. In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion. On cross-examination, inquiry is allowable into relevant specific instances of conduct.

(b) Specific instances of conduct. In cases in which character or a trait of character of a person is an essential element of a charge, claim, or defense, or where the character of the victim relates to the reasonableness of force used by the accused in self defense, proof may also be made of specific instances of that person's conduct.

¶24 Daniels first argues the court erred in disallowing defense cross-examination concerning specific instances of Buddy's violent conduct under Rule 405(a). As noted, the State called Hagen as a witness, and during the defense cross-examination, Hagen testified to Buddy's reputation for being a fighter without objection from the State. Daniels construes Rule 405(a) to permit *further* defense cross-examination about specific instances of Buddy's conduct because reputation evidence was elicited during earlier defense questioning of Hagen. In other words, Daniels argues that the last sentence of M. R. Evid. 405(a) permitted the defense to conduct cross-examination regarding specific instances of Buddy's conduct once the defense had elicited evidence of Buddy's reputation. We disagree with Daniels' interpretation of the Rule. Rule 405(a) permits cross-examination about specific instances of conduct by a party who is *adverse* to the witness' reputation or opinion testimony, not by the *same* party. *See* § 26-1-101(1),

¶ 19; *Sattler*, ¶ 45. Here, Daniels conceded in both his response to the State's motion and at the pre-trial hearing that a victim's character is not an essential element of the JUOF defense. Therefore, we do not analyze Daniels' evidentiary arguments in the context of M. R Evid. 404(c), but rather under M. R. Evid. 404(a)(2). This approach is reinforced by Daniels' argument to the District Court, in support of introduction of Buddy's character evidence, that "[a]n exception is allowed when the character trait of the victim is offered by the accused," thereby implicitly relying on M. R. Evid. 404(a)(2).

MCA (emphases added) ("'Direct examination' is the *first* examination of a witness on a particular matter. 'Cross-examination' is the examination of a witness by a party *other than the direct examiner*."); *see also State v. Jones*, 48 Mont. 505, 516, 139 P. 441, 445 (1914) (first emphasis in original) ("As the favorable [reputation] testimony tends to sustain the presumption of innocence which the law indulges in favor of the defendant, by introducing it the defendant tenders an issue of fact, *viz.*, whether his reputation is such as the witnesses say it is, and the *prosecution* has the right to *cross-examine* the witnesses to ascertain the sufficiency of the grounds upon which they base their statements."). Otherwise, a party could offer reputation evidence and thereby open the door to further examination about specific instances, an interpretation which would swallow the rule. We conclude the District Court did not abuse its discretion.

¶25 Daniels next argues that "[t]he court abused its discretion by disallowing [him] the ability, on cross-examination, to present evidence of specific acts of Buddy's violent past and reputation for violence" until proper foundation had been laid by Daniels' testimony. (Emphasis omitted.) He argues the District Court erroneously relied on pre-HB 228 cases such as *Logan*, *Cartwright*, and *Montgomery*.

¶26 In *Logan*, the defendant was charged with first degree murder and had given notice of his intention to claim self-defense. *Logan*, 156 Mont. at 52, 473 P.2d at 835. We held that evidence of the victim's reputation was admissible only after the issues of self-defense and the identity of the aggressor had been raised. *Logan*, 156 Mont. at 64, 473 P.2d at 842. Concluding the defendant had not yet joined these issues when making

his offers of proof, "no foundation then existed for the admission of this testimony" and the district court properly excluded the evidence. *Logan*, 156 Mont. at 65, 473 P.2d at 842. In *Cartwright*, the defendant challenged the district court's refusal of evidence of threats made by the victims and their family. *Cartwright*, 200 Mont. at 103, 650 P.2d at 764. The defendant did not admit to the killing, stating only that he did "not remember firing any shots." *Cartwright*, 200 Mont. at 104, 650 P.2d at 765. Affirming, we held that "'the accused must first lay a foundation that he acted in self defense before he can introduce evidence of the violent character of the victim'" (citation omitted), noting *Logan*'s statement that "'[u]ntil such time as defendant took the stand and admitted the killing, the issue of self defense was not joined at the trial.'" *Cartwright*, 200 Mont. at 104, 650 P.2d at 764-65 (quoting *Logan*, 156 Mont. at 65, 473 P.2d at 842). In *Montgomery*, the defendant shot and killed a man in his home who turned out to be an individual the defendant had fought with earlier. *Montgomery*, ¶¶ 3-4. We held that the defendant "must establish that he knew he was shooting [the victim], that he knew of [the victim's] past violent conduct, and that his knowledge of this conduct led him to use the level of force he did." *Montgomery*, ¶ 19. We concluded that evidence of the victim's past was "irrelevant and inadmissible," since the defendant "did not establish that his knowledge of [the victim's] past led him to use the level of force he employed." *Montgomery*, ¶ 20.[8]

---

[8] *See also Deschon v. State*, 2008 MT 380, ¶ 24, 347 Mont. 30, 197 P.3d 476 ("Evidence of the violent nature of the alleged victim of an assault is limited to what the defendant knew at the

¶27 In contrast to Daniels' assertion that pre-HB 228 cases on foundation and relevance have been overruled, the discussions in *Montgomery*, reiterated in *Deschon* and *Henson*, as to the foundation required for admission of character evidence of the victim, remain good law. "Evidence which is not relevant is not admissible." M. R. Evid. 402. Consequently, "[s]ince [the defendant] did not establish that his knowledge of [the victim's] past led him to use the level of force he employed, [the victim's] past was irrelevant and inadmissible." *Montgomery*, ¶ 20; *see also Deschon*, ¶ 24; *Henson*, ¶ 27. While the burden may shift to the State to prove the absence of justification under § 46-16-131, MCA (2009), this burden does not eliminate the need to satisfy foundational requirements for the admissibility of evidence pursuant to the Rules of Evidence.[9]

¶28 The District Court did not err in requiring Daniels to lay a proper foundation, here, by testifying. Given the circumstances here, the court properly determined that Daniels' testimony was necessary to provide the requisite foundation for the evidence of Buddy's past which he initially intended to offer. Daniels fails to specifically demonstrate how the foundation for his proffered evidence could have otherwise been established, and therefore, we need not address whether the foundation could have been alternatively laid. And, in the end, Daniels did not offer evidence of the two incidents in Buddy's past

---

time he used force against the victim, and it is also required that the defendant show this knowledge led him to use the level of force he did.").

[9] There is no dispute on appeal that Daniels raised and joined the defense of JUOF during trial. Therefore, the State correctly notes that the discussions in *Cartwright* and *Logan*, premised upon whether self-defense had been joined, do not apply. To the extent that the District Court's reliance on these cases could be considered error, it was harmless, as the court correctly analyzed relevance pursuant to *Montgomery*.

19

which the District Court had approved following his offer of proof, but rather testified that it was the events of the evening in question which motivated his behavior. The District Court did not abuse its discretion.

### ii.) Constitutional arguments

¶29 Daniels argues, "[b]y requiring Larry's testimony to provide foundation for Buddy's character and reputation, the court shifted the burden of proof to Larry," thereby violating his constitutional right to due process. Daniels argues sufficient objections exist for the review of this issue on direct appeal, but alternatively requests we apply plain error review.

¶30 Daniels filed a pre-trial motion in limine requesting the court to exclude "any argument by the prosecution that would tend to shift the burden of proof pursuant to the U.S. and Montana Constitutions and § 46-16-204, M.C.A." (Emphasis omitted.) Prior to opening statements at trial, the District Court granted Daniels' motion, stating: "Then there's some question about shifting the burden of proof. I'm going to believe that the State isn't going to attempt to do so. And if you think that the State is treading on thin ice in that regard, you need to let me know. But that request is granted." Daniels offered no objection during the trial.

¶31 Generally, "[a] defendant must make a timely objection to properly preserve an issue for appeal." *State v. Paoni*, 2006 MT 26, ¶ 35, 331 Mont. 86, 128 P.3d 1040; *see also* §§ 46-20-104(2) and -701, MCA. While "we have repeatedly approved the use of a motion in limine to preserve an objection for appeal 'provided the objecting party makes

20

the basis for his objection clear to the district court,'" *State v. Vukasin*, 2003 MT 230, ¶ 29, 317 Mont. 204, 75 P.3d 1284 (citation omitted), the objector is still obligated to make the basis and grounds for the objection clear to the court. *State v. Weeks*, 270 Mont. 63, 85, 891 P.2d 477, 490 (1995). Further, the "specific objections must be made to portions of testimony deemed inappropriate; broad general objections do not suffice." *Weeks*, 270 Mont. at 85, 891 P.2d at 490. Consequently, we conclude that Daniels' motion in limine did not preserve an objection for appeal since his motion was generalized, and did not provide notice to the court of the specific action to which he objected. *See Vukasin*, ¶ 38; *State v. Ferguson*, 2005 MT 343, ¶ 66, 330 Mont. 103, 126 P.3d 463.

¶32    We invoke the plain error doctrine sparingly, on a case-by-case basis. *State v. Lindberg*, 2008 MT 389, ¶ 34, 347 Mont. 76, 196 P.3d 1252. For plain error review of an unpreserved issue, "the appealing party must (1) show that the claimed error implicates a fundamental right and (2) 'firmly convince' this Court that failure to review the claimed error would result in a manifest miscarriage of justice, leave unsettled the question of the fundamental fairness of the trial or proceedings, or compromise the integrity of the judicial process." *State v. Norman*, 2010 MT 253, ¶ 17, 358 Mont. 252, 244 P.3d 737 (citations omitted).

¶33    A fundamental principle of our criminal justice system is that the State prove every element of a charged offense beyond a reasonable doubt, *State v. Price*, 2002 MT 284, ¶ 33, 312 Mont. 458, 59 P.3d 1122 (citing *In re Winship*, 397 U.S. 358, 363-64, 90

S. Ct. 1068, 1072-73 (1970), and we have previously stated "[i]f the burden of proof was shifted as [the defendant] claims, there is no doubt his fundamental constitutional rights have been violated." *Price*, ¶ 33. Evidentiary foundation is a related, but separate issue from determining which party bears the burden of proof. As we have discussed herein, by requiring Daniels to comply with evidentiary requirements, the District Court did not impermissibly shift the burden of proof on an element of the offense. Further, the District Court was clear at trial that the State bore the burden of proof to prove the elements of deliberate homicide as well as the absence of JUOF, and so instructed the jury. Thus, we are not "'firmly convince[d]'" that failure to review Daniels' claim would result in "a manifest miscarriage of justice, leave unsettled the question of the fundamental fairness of the trial . . . or compromise the integrity of the judicial process," and we decline to invoke the plain error doctrine. *Norman*, ¶ 17 (citations omitted).

¶34 Daniels raises a second constitutional argument. He asserts "[b]y compelling Larry to testify in order to lay the foundation  for his justification evidence, the court violated his Fifth Amendment right to remain silent" under the United States Constitution, and Article II, Section 25, of the Montana Constitution. The State answers that Daniels never objected that he was being compelled to testify, and notes that he does not seek plain error review of this issue. In reply, Daniels argues his right to remain silent argument is properly preserved for appeal because of "numerous references to the Fifth Amendment throughout the record."

22

¶35 Daniels is correct that there are references to the Fifth Amendment in the record; however, they do not encompass the argument he is asserting on appeal. When the State filed its motion in limine, it requested that Daniels testify during a pre-trial hearing to lay a proper foundation for his evidence. In response, Daniels' counsel vigorously opposed that suggestion, arguing "the most important reason that we object to this, Your Honor, is that what they're asking for is some look into Mr. Daniels' mind. . . . Well, he has a Fifth Amendment right to keep that to himself. Whether he testifies or not *at trial*, is also up to him. . . . If he wants to give it up *at trial*, he can do that." (Emphases added.) The District Court ruled:

> I think the Fifth Amendment, and then the Montana constitution protections, as well, preclude the Court from requiring the defendant to take the stand *at this time* and make such a showing. And if he fails to make such a showing *at any time*, that evidence is irrelevant and inadmissible.

(Emphases added.) Thus, Daniels raised his Fifth Amendment right to remain silent during the pre-trial hearing, and prevailed there on his argument. However, he also indicated the likelihood he would testify at trial, which he did. During trial, Daniels' counsel stated repeatedly that Daniels would testify and offered no objection to his doing so based upon the Fifth Amendment. Daniels has not asserted, either in the District Court or on appeal, that he would have declined to testify had the court not made its ruling. *See State v. Kutnyak*, 211 Mont. 155, 172, 685 P.2d 901, 910 (1984) ("defense counsel neither objected to the ruling[s] of the trial judge nor asserted that his client could not be compelled to testify to establish self-defense. In addition, he never stated during trial or

23

on appeal that he would not have had his client testify if the trial judge had not made that ruling.").

¶36 "'It has long been the rule of this Court that on appeal we will not put a District Court in error for a ruling or procedure in which the appellant acquiesced, participated, or to which appellant made no objection. Acquiescence in error takes away the right of objecting to it. This Court will not hold a district court in error when it has not been given an opportunity to correct itself.'" *State v. English*, 2006 MT 177, ¶ 71, 333 Mont. 23, 140 P.3d 454 (citation omitted). We hold that Daniels' constitutional argument has not been properly preserved for appeal.

¶37 ***2. Did the District Court err by refusing Daniels' proposed jury instructions on justifiable use of force in defense of an occupied structure and burglary as a forcible felony?***

¶38 "[D]istrict courts are accorded broad discretion in formulating jury instructions." *State v. Archambault*, 2007 MT 26, ¶ 25, 336 Mont. 6, 152 P.3d 698. We review decisions regarding jury instructions for an abuse of discretion. *State v. Cybulski*, 2009 MT 70, ¶ 34, 349 Mont. 429, 204 P.3d 7. When considering if the district court has erred in its jury instructions, "we determine whether the instructions, taken as a whole, fully and fairly instruct the jury regarding the applicable law." *Archambault*, ¶ 14; *see also State v. DaSilva*, 2011 MT 183, ¶ 15, 361 Mont. 288, 258 P.3d 419. A mistake in rendering the instructions "must prejudicially affect the defendant's substantial rights" to constitute reversible error. *Cybulski*, ¶ 34.

24

¶39 Daniels argues the court erred in refusing his proffered jury instruction concerning the defense of an occupied structure under § 45-3-103, MCA (2009). Daniels argues that this refused jury instruction had "ample evidentiary support" in the record.

¶40 Section 45-3-103, MCA (2009), pertaining to the use of force in defense of an occupied structure, was amended by HB 228. It states:

> (1) A person is justified in the use of force or threat to use force against another when and to the extent that the person reasonably believes that the use of force is necessary to prevent or terminate the other person's unlawful entry into or attack upon an occupied structure.
> (2) A person justified in the use of force pursuant to subsection (1) is justified in the use of force likely to cause death or serious bodily harm only if:
> (a) the entry is made or attempted and the person reasonably believes that the force is necessary to prevent an assault upon the person or another then in the occupied structure; or
> (b) the person reasonably believes that the force is necessary to prevent the commission of a forcible felony in the occupied structure.

Section 45-3-103, MCA (2009). HB 228 deleted the language previously contained in the provision that the entry had to be made or attempted "in violent, riotous, or tumultuous manner" to justify use of force. Laws of Montana, 2009, ch. 332, § 4, at 2273.[10]

¶41 We have previously explained that "an unlawful entry is a prerequisite to asserting the defense of justifiable use of force in defense of an occupied structure." *State v. Hagen*, 273 Mont. 432, 440, 903 P.2d 1381, 1386 (1995); *see also State v. Sorenson*, 190

---

[10] The prior version stated, in part: A person "is justified in the use of force likely to cause death or serious bodily harm only if: (1) *the entry is made or attempted in violent, riotous, or tumultuous manner* and he reasonably believes that such force is necessary to prevent an assault upon or offer of personal violence to him or another then in the occupied structure . . . ." Section 45-3-103(1), MCA (2007) (emphasis added).

Mont. 155, 170, 619 P.2d 1185, 1194 (1980) (emphasis in original) ("By its terms, this section [§ 45-3-103, MCA] only applies to efforts of a defendant to prevent or terminate an unlawful *entry* into occupied premises. It has no application to a lawful entry into premises."); *State v. Beach*, 247 Mont. 147, 150, 805 P.2d 564, 566 (1991). Daniels attempts to distinguish *Hagen*, *Sorenson*, and *Beach* from his case because the statute was amended by HB 228. Notably, however, the statute as amended by HB 228 still contains the same key phrase "unlawful entry into or attack upon an occupied structure" that the versions in our prior cases relied upon.

¶42    "A district court must only instruct the jury on those theories and issues which are supported by evidence presented at trial." *Hagen*, 273 Mont. at 438, 903 P.2d at 1385. The evidence at trial indicated the following: Daniels signed the Residential Lease-Rental Agreement, but Buddy was listed on the lease under the section entitled "Additional Occupants," denoting that he was to "occupy the premises" along with Hagen and Logan. The realtor who had facilitated the lease testified that each person was to have free use of the property, and that the lease agreement was intended to cover both homes. Hagen testified the property was considered to be a "whole family estate" and a "family home," and he felt free to move about the whole property, often going between the two houses. Logan testified that people "[p]retty much" went where they wanted on the property, and that Buddy also went to Daniels' house. Logan also testified that he went to Daniels' house every day and slept there "[a] few times." Logan testified that Daniels never knocked when entering the main house, and that he, Hagen and Buddy

26

never knocked when entering Daniels' house. While Daniels testified that he always locked his house when he left, he also testified that Logan had a key and the family knew that they could "jimmy the door [open] from the shop." While Daniels argues on appeal that "family members very rarely entered into each others' bedrooms," both Hagen and Logan testified that they had been in Daniels' bedroom. Finally, when asked if he ever told other family members not to enter his house, Daniels testified that he had never said that to Logan, and had only told Hagen not to come inside if Hagen was going to use bad language.

¶43 We conclude that the evidence clearly established that Buddy was not a trespasser into Daniels' house, that he was a co-occupant, and that his entry into Daniels' house was lawful. Because "an unlawful entry is a prerequisite to asserting the defense of justifiable use of force in defense of an occupied structure," *Hagen*, 273 Mont. at 440, 903 P.2d at 1386, the District Court correctly denied Daniels' proffered jury instruction.

¶44 Daniels also argues the District Court erred by refusing to include the definition of burglary as a forcible felony for consideration with his defense of JUOF in defense of a person. When instructing the jury on JUOF to defend a person, the District Court instructed the jury that a "forcible felony" means "any felony which involves the use or threat of physical force or violence against any individual." *See* § 45-3-101(2), MCA. The District Court included aggravated assault as a forcible felony within the instructions, giving the definition for aggravated assault under § 45-5-202(1), MCA. Daniels asked that burglary be added as a forcible felony for the jury to consider under

27

§ 45-3-102, MCA.[11]  The District Court declined to do so, reasoning that there were insufficient facts to demonstrate that Buddy's entry into Daniels' house was unlawful.

¶45   An individual commits burglary if "he knowingly *enters or remains unlawfully* in an occupied structure with the purpose to commit an offense therein."  Section 45-6-204(1), MCA (emphasis added).  Additionally, "[a] person enters or remains unlawfully in or upon any vehicle, occupied structure, or premises when he is not licensed, invited, or otherwise privileged to do so. . . .  The privilege may be revoked at any time by personal communication of notice by the landowner or other authorized person to the entering person."  Section 45-6-201(1), MCA.

¶46   Daniels argues enough evidence existed to support the theory that Buddy unlawfully entered Daniels' house to support including burglary in the forcible felony instruction.  However, as indicated by the above discussion, the evidence established that Buddy's entrance into Daniels' house was lawful for purposes of the jury instruction on JUOF in defense of an occupied structure, and we also hold that Buddy's entry was not unlawful for purposes of the burglary statute.  "To constitute a burglary the nature of the entry must itself be a trespass."  *State v. Feldt*, 239 Mont. 398, 400, 781 P.2d 255, 256 (1989).  Daniels concedes that "Buddy was on the lease," and the evidence indicated that the family members had leave to be in both houses.  While Buddy may have committed

---

[11] Section 45-3-102, MCA, provides "[a] person is justified in the use of force or threat to use force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force.  However, he is justified in the use of force likely to cause death or serious bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or serious bodily harm to himself or another or *to prevent the commission of a forcible felony*."  (Emphasis added.)

unlawful acts that night, he did not commit burglary. His entry was not contingent upon Daniels' permission, and by his words, Daniels could not transform Buddy's lawful presence into a trespass. The District Court correctly denied Daniels' proffered instruction on burglary as a forcible felony.

¶47    Affirmed.

/S/ JIM RICE

We concur:

/S/ MIKE McGRATH
/S/ PATRICIA COTTER
/S/ MICHAEL E WHEAT
/S/ BRIAN MORRIS