DA 12-0103

IN THE SUPREME COURT OF THE STATE OF MONTANA

2013 MT 139

STATE OF MONTANA,

       Plaintiff and Appellee,

v.

NATHAN GERALD KING,

       Defendant and Appellant.


APPEAL FROM:    District Court of the Eighth Judicial District,
In and For the County of Cascade, Cause No. DDC 10-505(b)
Honorable Julie Macek, Presiding Judge


COUNSEL OF RECORD:

      For Appellant:

          Nancy G. Schwartz, NG Schwartz Law, PLLC; Billings, Montana

      For Appellee:

          Timothy C. Fox, Montana Attorney General, Jonathan Mark Krauss, Assistant Attorney General; Helena, Montana

          John Parker, Cascade County Attorney, Susan Weber, Deputy County Attorney, Great Falls, Montana


Submitted on Briefs:  April 10, 2013
Decided:  May 28, 2013


Filed:


                        Clerk

Justice Michael E Wheat delivered the Opinion of the Court.

¶1      Nathan King (King) appeals from an order of the Eighth Judicial District Court, Cascade County, entered after a jury convicted him of one count of deliberate homicide and one count of aggravated assault.  We affirm.

¶2      We address the following issues for review:

¶3      *Issue One:  Did the District Court err by excluding evidence of justifiable use of force as a defense to the charge of deliberate homicide?*

¶4      *Issue Two:  Did the District Court err by excluding evidence of Terrey's prior mental health history, suicide attempts and cutting behavior, and did this exclusion violate King's Sixth Amendment right to compulsory process and confrontation and Fourteenth Amendment right to due process?*[1]

## FACTUAL AND PROCEDURAL BACKGROUND

¶5      In the afternoon of December 2, 2010, law enforcement was dispatched to a trailer park in Great Falls, Montana, regarding a report of disturbance possibly involving a homicide.  Upon arrival at the trailer park, officers made contact with a young woman named

---

[1] The State also raises the issue of whether King waived any challenge to his conviction for aggravated assault by failing to assert or adequately brief any grounds for reversal thereof.  King responds that the "viability of [his] defense as to [the aggravated assault charge] rested upon a finding that [he] was not criminally culpable for the actions set forth in [the deliberate homicide charge]."  He argues that if we find in his favor with respect to his challenges to his deliberate homicide conviction, we should remand the case for a new trial on both the deliberate homicide charge and the aggravated assault charge.  King admits, however, that he did not make a separate argument challenging his aggravated assault conviction.  He concedes that if we do not find in his favor with respect to his challenges to his deliberate homicide conviction, he has no basis to challenge the aggravated assault conviction.  We do not find for King and, accordingly, do not address any argument pertaining to his aggravated assault conviction.

2

Sara Thompson (Thompson). Thompson had blood on her face and immediately informed the officers that her roommate, Christopher Terrey (Terrey), was in her trailer and in need of medical assistance.

¶6 The officers entered Thompson's trailer, which was in complete disarray and had broken items strewn about. They quickly discovered Terrey, who was lying face down in a large pool of blood in the doorway of a bedroom. There was a broken blade of a knife underneath his body and a knife handle nearby. An officer determined Terrey was dead, and an autopsy later revealed the cause of death was blood loss as a result of a knife wound to his left carotid artery. There were several other scrapes and wounds on his body.

¶7 Meanwhile, law enforcement pursued a male suspect who was seen fleeing from the trailer when the officers first arrived. The suspect was unresponsive to the officers' commands and was eventually tased and transported to jail. The suspect was identified as King.

¶8 Police interviews and trial testimony revealed a more detailed picture of the events of December 2, 2010. Thompson lived in the trailer with her boyfriend, King, their five-year-old daughter, Zoe, and their friend and co-worker, Terrey. At the time of the incident, King was 26 years old, Thompson was 25 years old, and Terrey was 20 years old. King, Thompson, and Terrey were CNAs at Park Place Healthcare, and all three worked the night shift that began December 1, 2010, and ended the morning of December 2, 2010, at approximately 6:45 am. After returning home from work on the morning of December 2,

3

Thompson went to her bedroom to sleep while King and Terrey stayed up to drink and play video games.

¶9    Over the next few hours, King and Terrey continued to drink, play video games, and wrestle with each other. At two different times, King and Terrey entered Thompson's bedroom. Terrey got into Thompson's bed and attempted to cuddle her; King told Thompson to "just go with it." Thompson testified the behavior was strange and made her feel very uncomfortable.

¶10    Thompson became increasingly irritated at King and Terrey and frustrated that she was not able to sleep. After King and Terrey entered her bedroom the second time, Thompson decided to drive to a friend's home. As Thompson was leaving her trailer, Terrey's mother, Bonita, and cousin, Lyle, arrived. Bonita and Lyle stayed for a short period of time, briefly talking with Terrey and King, and then left. Thompson stayed at her friend's home for just over an hour and then returned to her trailer.

¶11    During the roughly one-hour time period after Bonita and Lyle left Thompson's trailer and before Thompson returned, Terrey and King were the only two people in the trailer. King's version of events were provided in a recorded statement he made to law enforcement on February 4, 2011, which was shown to the jury during his trial. In the recording, King stated that after Bonita and Lyle left, King attempted to go to sleep on the couch in the living room. After hearing noises in the kitchen, King got up and found Terrey in a very agitated state. According to King, Terrey was upset and asked King if Thompson was going to be mad at them. Despite King assuring him that she would not, King said Terrey became very

4

emotional, told King that he was going to kill himself, and then grabbed a knife out of the butcher's block. King maintained he was aware that Terrey had attempted suicide in the past and had marks on his arm from cutting himself.

¶12    King said he began yelling at Terrey to drop the knife. A struggle ensued during which he and Terrey fell to ground at least two times. King eventually grabbed a knife and held it to Terrey's neck threatening to cut his head off. At some point, King's knee was cut, and King allegedly began to fear for his own safety. King said he grabbed Terrey's arms in a shoulder hold from behind and the two slipped on the linoleum and fell to the floor. King noticed Terrey immediately relax. According to King, the next thing he remembered was Thompson entering the trailer.

¶13    Thompson testified that when she arrived home she heard a bang. She entered the trailer and saw the Christmas tree and its decorations scattered all over the living room floor. Thompson noticed King in the kitchen, who looked "shock[ed], blank," and had dried blood all over his bare chest. After Thompson asked King where Terrey was, Thompson testified that King replied, "[It] wasn't supposed to be like this." Thompson walked toward Terrey's bedroom and saw Terrey lying flat down on his stomach with his head in a pool of blood.

¶14    Thompson proceeded to assure King that they "could fix this," while backing into the bathroom. King followed her into the bathroom, put his hands around her throat, and began throwing her around. King grabbed Thompson's phone from her and threw it. Thompson testified she somehow ended up in Terrey's room on top of Terrey's body. Terrey made a "death gurgle," but was otherwise unresponsive. King proceeded to choke Thompson, slam

her into a wall, gouge her eye, and knock two teeth out of her mouth. Finally, Thompson managed to run to her vehicle, with King chasing behind her. Thompson drove to a nearby house and yelled for a neighbor to call 911. Law enforcement arrived on scene and arrested King. King was charged with one count of felony deliberate homicide of Terrey and one count of felony aggravated assault of Thompson.

¶15 Prior to trial, King filed a notice of intent to use the defense of justifiable use of force "in defense of his person and to try to prevent Christopher Terrey from committing suicide." The State moved to deny King from asserting both theories of justifiable use of force—self-defense and justifiable use of force in defense of another—arguing an inherent conflict in doing so. The State also moved to limit the use of character evidence of Terrey, specifically as to the admissibility of Terrey's mental health records. In response, King asserted that Terrey's mental health records show a long mental health history with at least two suicide attempts as well as cutting behaviors. King maintained the records were relevant as to whether Terrey was attempting to commit suicide at the time of the incident.

¶16 The District Court held a hearing on the motions on August 24, 2011. The court granted the State's motion regarding King's affirmative defenses and prohibited King from arguing or presenting the legal theory of justifiable use of force in defense of another at trial. The court determined the defense only applies when the defendant reasonably believes the force is necessary to prevent imminent death or serious bodily harm to a third party. Accordingly, the court concluded that as a matter of law the defense was not available under

6

the facts and argument King presented—that King used deadly force against Terrey in order to prevent Terrey from killing himself.

¶17    The court did not preclude King from presenting a self-defense claim. The court pointed out, however, that it had been "provided with extremely limited information as to the factual basis" for such a defense, and that the factual theory presented by both the State and King was an accident theory. Noting that an accident theory is inconsistent with a justifiable use of force theory, the court stated there would have to be sufficient facts in the record to support the latter theory before the court would instruct the jury on it at trial.

¶18    With respect to the State's motion to limit character evidence of Terrey, the court provided a detailed analysis of admissibility under M. R. Evid. 404(a), 404(c), and 405. The court concluded that any evidence regarding specific prior instances of suicide attempts or cutting in order to prove that it was more likely that Terrey was attempting suicide or cutting himself on the date of the incident was prohibited. However, the court determined that under the second exception provided in M. R. Evid. 405(b), such evidence was admissible as it related to the reasonableness of force used by King in self-defense so long as there were sufficient facts in the record to indicate that (1) King knowingly or purposely caused the death of Terrey; (2) King claimed it was necessary for him to use deadly force against Terrey; and (3) the specific instances of suicide attempts or cutting that were in fact known to King at the time of the incident would be relevant and admissible to prove that the level of force King used was reasonable.

¶19 A jury trial was held September 12-23, 2011. King never admitted that he committed the crime of deliberate homicide, and he did not pursue a claim of self-defense at trial. Rather, King presented a defense of lack of intent and argued that Terrey's death was an accident. On September 23, 2011, King was found guilty of one count of deliberate homicide and one count of aggravated assault. For the offense of deliberate homicide, the District Court sentenced King to 100 years in the Montana State Prison with a parole eligibility restriction of 25 years. For the offense of aggravated assault, the District Court sentenced King to 20 years in the Montana State Prison with a parole eligibility restriction of the entire 20 years. The two sentences were ordered to run consecutively. King appeals.

## STANDARD OF REVIEW

¶20 A district court's decision regarding the admissibility of evidence will not be reversed absent an abuse of discretion. *State v. Buslayev*, 2013 MT 88, ¶ 9, 369 Mont. 428, 299 P.3d 324. A district court abuses its discretion if it acts arbitrarily without the employment of conscientious judgment or exceeds the bounds of reason, resulting in substantial injustice. *State v. Derbyshire*, 2009 MT 27, ¶ 19, 349 Mont. 114, 201 P.3d 811. In exercising its discretion, however, the district court is bound by the Rules of Evidence or applicable statutes. *Derbyshire*, ¶ 19. Therefore, to the extent the district court's ruling is based on an interpretation of an evidentiary rule or statute, our review is de novo. *Derbyshire*, ¶ 19.

¶21 The Court exercises plenary review of constitutional issues. *State v. Hauer*, 2012 MT 120, ¶ 23, 365 Mont. 184, 279 P.3d 149.

## DISCUSSION

¶22    *Issue One: Did the District Court err by excluding evidence of justifiable use of force as a defense to the charge of deliberate homicide?*

¶23    King argues the District Court prohibited him from presenting evidence supporting a justifiable use of force defense on the basis that it was inconsistent with his accident defense. He cites several cases that stand for the proposition that "the mere fact" that two defenses are inconsistent does not justify barring the defendant from presenting both.

¶24    Contrary to King's assertion, however, the District Court did not preclude a self-defense or justifiable use of force in defense of another claim for "the mere fact" that they were inconsistent with an accident defense. As already explained, there was nothing in the District Court's pretrial order that prevented King from raising a self-defense claim. The order only provided that prior to a jury instruction on self-defense, there would need to be "sufficient facts in the record to find that although the defendant purposely or knowingly caused the death of another he was justified in doing so because he reasonably believed that the use of deadly force was necessary to prevent imminent death or serious bodily harm to himself . . . ." King maintains even this requirement was in error, arguing that a defendant should not be forced to concede that he acted purposely or knowingly before he is entitled to a jury instruction on self-defense.

¶25    A district court's discretion regarding jury instructions is broad, but is restricted by the overriding principle that jury instructions must fully and fairly instruct the jury regarding the applicable law. *State v. Daniels*, 2011 MT 278, ¶ 38, 362 Mont. 426, 265 P.3d 623. A district court must only instruct the jury on theories and issues that are supported by evidence

9

presented at trial. *Daniels*, ¶ 42. Section 45-3-102, MCA, governs the theory of justifiable use of force and states:

> A person is justified in the use of force or threat to use force against another when and to the extent that the person reasonably believes that the conduct is necessary for self-defense or the defense of another against the other person's imminent use of unlawful force. However, the person is justified in the use of force likely to cause death or serious bodily harm only if the person reasonably believes that the force is necessary to prevent imminent death or serious bodily harm to the person or another or to prevent the commission of a forcible felony.

¶26 Section 45-3-115, MCA, further provides that justifiable use of force is an affirmative defense, "which we have defined as 'one that admits the doing of the act charged, but seeks to justify, excuse or mitigate it.'" *Daniels*, ¶ 15 (quoting *State v. Nicholls*, 200 Mont. 144, 150, 649 P.2d 1346, 1350 (1982)). The act charged in this case was deliberate homicide under § 45-5-102(1)(a)(2009), MCA, which provides that the accused "purposely or knowingly caus[ed] the death of another human being." Therefore, as we have previously stated, a defendant who relies upon the defense of justifiable use of force concedes that he acted purposely or knowingly. *State v. Nick*, 2009 MT 174, ¶ 13, 350 Mont. 533, 208 P.3d 864 (citing *State v. Houle*, 1998 MT 235, ¶ 15, 291 Mont. 95, 966 P.2d 147; *State v. Sunday*, 187 Mont. 292, 306, 609 P.2d 1188, 1197 (1980)). Given this, there was no error in the District Court's order requiring evidence that King purposely or knowingly caused Terrey's death before instructing the jury on self-defense.

¶27 With respect to justifiable use of force in defense of another, the District Court prohibited King from presenting the defense because it determined as a matter of law that the

10

defense was not available in a situation involving only two people. The District Court dissected § 45-3-102, MCA, and reasoned that defense of another must include three people: the defendant, the aggressor, and the third party who requires protection of the defendant from the aggressor. The court therefore concluded that King's act of killing Terrey could not be legally justified on the grounds that King had to use deadly force against Terrey to keep Terrey from killing himself.

¶28 King challenges this ruling, and asserts that the availability of using force in the defense of others who are attempting to commit suicide is "not necessarily illogical and is actually codified in other states." King cites § 161.205(4) of the Oregon Revised Statutes, which states that "[a] person acting under a reasonable belief that another person is about to commit suicide or to inflict serious physical self-injury may use physical force upon that person to the extent that the person reasonably believes it necessary to thwart the result." While this statute may provide a defense for a person who uses force in attempt to prevent another's suicide, and thereby demonstrate that such a defense is "not necessarily illogical," it is comprised of completely different language than § 45-3-102, MCA, and cannot serve as guidance in our interpretation of our own statute. It is notable that the following section in the O.R.S.—§ 161.205(5)—provides that a person may use physical force upon another in self-defense or in defense of a third person. Oregon law has thus provided a specific defense for a person using force to prevent another from committing suicide, and a separate, more general defense for a person using force against another to protect oneself or a third party.

11

¶29     In construing a statute, this Court's job is "simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted or to omit what has been inserted." Section 1-2-101, MCA. We look first to the plain meaning of the words it contains. *In re D.B.J.*, 2012 MT 220, ¶ 40, 366 Mont. 320, 286 P.3d 1201. When the language is clear and unambiguous, the statute speaks for itself and we will go no further. *In re D.B.J.*, ¶ 40. Determining the plain meaning requires that we logically and reasonably interpret language by giving words their usual and ordinary meaning. *In re D.B.J.*, ¶ 40.

¶30     As set forth above, § 45-3-102, MCA, has two parts. The first provides that "[a] person is justified in the use of force . . . against another when and to the extent that the person reasonably believes that the conduct is necessary for self-defense or the defense of another against the other person's imminent use of unlawful force." This language makes a clear distinction between the person who is being defended and "the other" person who presents imminent use of unlawful force. A defense of another claim under this portion of the statute would thus require three people's involvement.

¶31     The second part of § 45-3-102, MCA, provides that "the person is justified in the use of force likely to cause death or serious bodily harm only if the person reasonably believes that the force is necessary to prevent imminent death or serious bodily harm to the person or another . . . ." King argues "another" may refer to the aggressor. However, considering § 45-3-102, MCA, as a whole, it is only logical that the three parties referred to in the first part of the statute are the same parties referred to in the second part. The purpose of the second part of § 45-3-102, MCA, is to provide the same defense as in the first—justifiable use of

12

force—just applied to a more serious situation involving deadly force or force likely to cause serious injury. There is nothing to indicate that the parties referred to are any different than those in the first part of the statute.

¶32 King's argument that § 45-3-102, MCA, provides a defense for a person who reasonably believes that deadly force against another is necessary to prevent that person from killing himself is illogical. If the legislature intended justifiable use of force in defense of another to be available to a person attempting to prevent another from committing suicide, it could have expressly included such a defense and articulated the type of force allowed, as seen in § 161.205(4), O.R.S. There, the legislature notably limited the extent of force allowed to that which is necessary to "thwart the result." It is clear that using deadly force to prevent someone from killing himself would not "thwart the result." Our legislature did not include any comparable defense, and until it decides to do so we will not insert one.

¶33 In sum, a logical interpretation of § 45-3-102, MCA, is that justifiable use of force in defense of another involves three parties: the defendant, the person being defended, and the aggressor. There is nothing in the plain language of the statute, nor any authority provided to this Court, to suggest that the defense applies to a situation involving only two people. We therefore determine the District Court correctly interpreted § 45-3-102, MCA, and did not abuse its discretion in excluding evidence of justifiable use of force in defense of another.

¶34 *Issue Two: Did the District Court err by excluding evidence of Terrey's prior mental health history, suicide attempts and cutting behavior, and did this exclusion violate King's*

13

*Sixth Amendment right to compulsory process and confrontation and Fourteenth Amendment right to due process?*

¶35    King argues evidence of Terrey's mental health history, including suicide attempts and cutting behavior, should have been admitted as "reverse 404(b) evidence." The District Court's failure to do so, King maintains, denied him a meaningful opportunity to present a complete defense and was a violation of his Sixth and Fourteenth Amendment rights.

¶36    The State counters that King failed to preserve these issues on appeal and therefore they should be dismissed. King concedes that he did not raise a "reverse 404(b)" argument before the District Court, but maintains it is nonetheless preserved under M. R. Evid. 103. King contends that M. R. Evid. 103(a)(2) provides a different standard for the preservation of error related to the exclusion of evidence, and that "King did all he needed to do by providing the [D]istrict [C]ourt with an offer of proof as to the evidence he wanted to admit."

¶37    Montana Rule of Evidence 103 provides in relevant part:

> (a) Effect of erroneous ruling. Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and
> . . .
> (2) Offer of proof. In case the ruling is one excluding evidence, the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked.

The reason for M. R. Evid. 103(a)(2) "is to require that if evidence is excluded there must be an offer of proof so that neither the trial court nor this Court has to speculate concerning what the evidence would have been." *In re O.A.W.*, 2007 MT 13, ¶ 51, 335 Mont. 304, 153 P.3d 6. An offer of proof allows counsel the ability to get evidence on the record where the

14

court determines that it should be excluded. *State v. Miller*, 231 Mont. 497, 508, 757 P.2d 1275, 1282 (1988). An offer of proof should be specific as to the facts to be proven. *Miller*, 231 Mont. at 508, 757 P.2d at 1282. A trial court cannot commit error without the arguing party informing the court that a specific course of action is legally improper. *Miller*, 231 Mont. at 508, 757 P.2d at 1282.

¶38 At the August 24, 2011 motions hearing, the District Court required that King file Terrey's mental health records for *in camera* inspection and to highlight or flag the specific portion of the records that King asserted should be admitted. In its subsequent order, the District Court pointed out that King filed approximately one hundred pages of medical records without any citation to the specific portions King contended were relevant. The court noted that as a result, there was "lack of a specific record based offer of proof." Furthermore, King never argued to the District Court that the records were "reverse 404(b) evidence," as he argues now, and the District Court's rulings on the admissibility of the evidence were thus based only on its analyses under M. R. Evid. 404(a), 404(c), and 405. We have stated numerous times that we will not fault a district court where it was not given an opportunity to correct itself. *In re B.I.*, 2009 MT 350, ¶ 16, 353 Mont. 183, 218 P.3d 1235. The District Court was not asked to determine whether the records were admissible as "reverse 404(b) evidence," and we will not now fault it for refusing to admit them as such. In addition to King's failure to properly preserve his "reverse 404(b)" argument, King has not referenced any place in the record where he objected on constitutional grounds to the exclusion of the evidence.

15

¶39 This Court ordinarily does not consider issues raised for the first time on appeal. *State v. Torres*, 2013 MT 101, ¶ 37, 369 Mont. 516, ___ P.3d ___. We may, however, review a claimed error under the plain error doctrine if the appellant:

(1) show[s] that the claimed error implicates a fundamental right and
(2) 'firmly convince[s]' this Court that failure to review the claimed error would result in a manifest miscarriage of justice, leave unsettled the question of the fundamental fairness of the trial or proceedings, or compromise the integrity of the judicial process.

*Torres*, ¶ 37. The decision to invoke plain error review is a discretionary one that is used sparingly, on a case-by-case basis, according to narrow circumstances, and by considering the totality of the case's circumstances. *State v. Mitchell*, 2012 MT 227, ¶ 10, 366 Mont. 379, 286 P.3d 1196. "'[A] mere assertion that constitutional rights are implicated or that failure to review the claimed error may result in a manifest miscarriage of justice is insufficient to implicate the plain error doctrine.'" *Mitchell*, ¶ 10.

¶40 In the case at hand, King has not specifically requested that we invoke the plain error doctrine. King asserts the claimed error denied him of his constitutionally protected right to present a defense, but he has not shown us how a failure to review the claimed error would result in a manifest miscarriage of justice, leave unsettled the question of the fundamental fairness of the trial, or compromise the integrity of the judicial process. In his reply brief, he argues that a statement made by the prosecutor in closing argument demonstrates the fundamentally unfair nature that resulted from the exclusion of evidence. Aside from the fact that we find his argument unpersuasive, and that King still did not explicitly request that we invoke the plain error doctrine, we have said before that we will not apply the plain error

doctrine when it was raised for the first time in a reply brief. *State v. Raugust*, 2000 MT 146,
¶ 19, 300 Mont. 54, 3 P.3d 115. We therefore decline to exercise plain error review.

## CONCLUSION

¶41     For the reasons stated above, we affirm the District Court's judgment.

¶42     Affirmed.

/S/ MICHAEL E WHEAT

We concur:

/S/ MIKE McGRATH
/S/ BETH BAKER
/S/ JIM RICE
/S/ BRIAN MORRIS