FILED

September 1 2015

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 13-0727

DA 13-0727

IN THE SUPREME COURT OF THE STATE OF MONTANA

2015 MT 260N

STATE OF MONTANA,

    Plaintiff and Appellee,

v.

CURTIS WAYNE STANLEY,

    Defendant and Appellant.

APPEAL FROM:    District Court of the Eighth Judicial District,
In and For the County of Cascade, Cause No. CDC-12-491
Honorable Kenneth R. Neill, Presiding Judge

COUNSEL OF RECORD:

    For Appellant:

        Wade Zolynski, Chief Appellate Defender, Gregory Hood, Assistant
Appellate Defender; Helena, Montana

    For Appellee:

        Timothy C. Fox, Montana Attorney General, Tammy K. Plubell, Assistant
Attorney General; Helena, Montana

        John Parker, Cascade County Attorney, Marvin Anderson, Deputy County
Attorney; Great Falls, Montana

Submitted on Briefs:  July 29, 2015
Decided:  September 1, 2015

Filed:

                        Clerk

Justice James Jeremiah Shea delivered the Opinion of the Court.

¶1 Pursuant to Section I, Paragraph 3(c), Montana Supreme Court Internal Operating Rules, this case is decided by memorandum opinion and shall not be cited and does not serve as precedent. Its case title, cause number, and disposition shall be included in this Court's quarterly list of noncitable cases published in the Pacific Reporter and Montana Reports.

¶2 On September 4, 2013, Curtis Stanley was convicted in the Eighth Judicial District Court, Cascade County, of two counts of felony assault with a weapon. The charges arose from an incident where Stanley brandished a baseball bat from which nails protruded at law enforcement officers who were assisting in executing a default judgment for possession against Stanley's then-girlfriend, Robyn Swan. On appeal, Stanley argues that the District Court abused its discretion in denying his proposed jury instruction on justifiable use of force and excluding evidence of an agreement between Swan's landlord, Dan Woods, and the Salvation Army to pay Swan's current month and delinquent rent due. We affirm.

¶3 On October 24, 2012, the District Court issued a default judgment for possession, ordering Swan to vacate her apartment by November 2, 2012. If Swan did not comply, the judgment provided that Woods "may take possession of the premises by reasonable means" and arrange for a law enforcement officer "to stand by and keep the peace." On November 2, 2012, Woods signed a Salvation Army Landlord Rental/Mortgage Acceptance Form (Salvation Army Agreement), agreeing "to accept funding from the Salvation Army for payment" of Swan's current month and delinquent rent due.

2

¶4 On November 15, 2012, Woods asked the Cascade County Sheriff's Office for assistance in enforcing the default judgment for possession. At that time, Woods had not informed the court or law enforcement officers of the Salvation Army Agreement, and the court had not set aside the October 24, 2012 default judgment for possession. Deputy Grove accompanied Woods to Swan's apartment, knocked on the door, and identified himself as a sheriff's deputy. Deputy Grove was dressed in his uniform, which includes a Kevlar bulletproof vest with an embroidered badge displayed on the chest. He also carried a radio, a handgun, extra magazines for the handgun, and handcuffs. Woods and Deputy Grove both testified that, after Deputy Grove knocked for several minutes, Stanley peered out of a window on the apartment door. Deputy Grove testified that he again identified himself as a deputy sheriff and asked Stanley, who was face-to-face with him, to open the door so that they could talk. Stanley covered the door window with a towel or blanket and did not open the door. Woods and Deputy Grove both testified that Deputy Grove's badge was visible when Stanley looked out of the door window.

¶5 When Stanley refused to open the door after looking out of the window, Deputy Grove requested backup assistance from another officer, Deputy Prater. Deputy Grove continued to knock on the door and identify himself for another forty minutes until Deputy Prater arrived, also in uniform. Deputy Grove testified that he called for backup for safety reasons because he could not see into the apartment and was unsure how many people were inside or if there were any weapons. While waiting for Deputy Prater to arrive, Woods called a locksmith, who was unable to successfully pick the lock.

3

Eventually, the property manager arrived with a spare key, which Deputy Grove used to unlock the door.

¶6    When Deputy Grove attempted to open the door, he discovered that Stanley had propped a chair under the door handle to block entry into the apartment. Deputy Grove forced the door open and entered the apartment with his gun drawn, followed by Deputy Prater. Deputy Grove continued to announce himself as law enforcement. After Deputy Grove took about five steps into the apartment, Stanley rushed at him from a hallway, brandishing a baseball bat from which nails protruded. The deputies drew their guns on Stanley and ordered him to stop. Stanley was about five or six feet away from Deputy Grove when he eventually stopped. Deputy Grove testified that, before Stanley dropped the bat, he yelled, "[W]ho the fuck are you, what are you doing in my house?" Deputy Grove said he was afraid that, if Stanley came any closer, Stanley would cause serious harm to him or Deputy Prater. According to Deputy Grove, the time period between when he arrived on scene and when he finally was able to gain access to the apartment was "well over an hour."

¶7    At trial, Stanley argued that he did not know that the individuals entering his home were police officers due to a hearing impairment and the fact that the home recently was burglarized. Stanley's grandmother and Swan both testified that Stanley is hearing-impaired, and Stanley's grandmother testified that Stanley did not have hearing aids during the incident. Swan testified that Stanley can read lips. Swan also testified that the apartment was broken into about one week before the November 15 incident. Swan was not at the apartment during the November 15 incident. She said that she called

4

Stanley to tell him he should open the door after a neighbor informed her that the deputies were outside of the apartment. Swan testified that she was unsure if Stanley understood her when she called him.

¶8 Before trial, the State of Montana filed two motions in limine: one to exclude all evidence regarding the Salvation Army Agreement, and the other to prohibit Stanley from arguing justifiable use of force without laying a proper foundation. Stanley opposed both motions. After a pre-trial hearing on the motions, the District Court granted the State's motion to exclude evidence of the Salvation Army Agreement, determining that the deputies' entry into Swan's apartment was lawful under the default judgment for possession. After hearing evidence presented at trial, the District Court also granted the State's motion on Stanley's justifiable-use-of-force defense, and denied Stanley's requested jury instructions on justifiable use of force. Stanley contends that these rulings violated his due-process rights.

¶9 We review for abuse of discretion a district court's evidentiary rulings and formulation of jury instructions. *State v. Daniels*, 2011 MT 278, ¶¶ 11, 38, 362 Mont. 426, 265 P.3d 623. A district court abuses its discretion when it "acts arbitrarily without the employment of conscientious judgment or exceeds the bounds of reason, resulting in substantial injustice." *State v. Derbyshire*, 2009 MT 27, ¶ 19, 349 Mont. 114, 201 P.3d 811. "[T]o the extent the court's ruling is based on an interpretation of an evidentiary rule or statute, our review is de novo." *Daniels*, ¶ 11 (quoting *Derbyshire*, ¶ 19).

¶10     Section 45-5-213(1), MCA, provides, "A person commits the offense of assault with a weapon if the person purposely or knowingly causes: (a) bodily injury to another with a weapon; or (b) reasonable apprehension of serious bodily injury in another by use of a weapon or what reasonably appears to be a weapon." In defending against a charge of assault with a weapon, a defendant may avail himself of the affirmative defense of justifiable use of force when he "admits the doing of the act charged, but seeks to justify, excuse or mitigate it." *State v. King*, 2013 MT 139, ¶ 26, 370 Mont. 277, 304 P.3d 1 (quoting *Daniels*, ¶ 15). However, "[a] district court must only instruct the jury on theories and issues that are supported by evidence presented at trial." *King*, ¶ 25 (citing *Daniels*, ¶ 42).

¶11     Stanley admitted to charging at the officers with a weapon and requested jury instructions on justifiable use of force in defense of a person, § 45-3-102, MCA,[1] and justifiable use of force in defense of an occupied structure, § 45-3-103, MCA. Under § 45-3-103(1), MCA, "A person is justified in the use of force or threat to use force against another when and to the extent that the person reasonably believes that the use of force is necessary to prevent or terminate the other person's unlawful entry into or attack upon an occupied structure." Under § 45-3-102, MCA, "A person is justified in the use of force or threat to use force against another when and to the extent that the person reasonably believes that the conduct is necessary for self-defense . . . against the other person's imminent use of unlawful force." At trial, Stanley conceded that a lawful entry

___

[1] All statutory references are to the 2011 version of the Montana Code Annotated unless otherwise noted.

would preclude the affirmative defense of justifiable use of force in defense of an occupied structure. *See also Daniels*, ¶ 41 (holding that an unlawful entry is a prerequisite to arguing justifiable use of force in defense of an occupied structure) (citing *State v. Hagen*, 273 Mont. 432, 440, 903 P.2d 1381, 1386 (1995)); *State v. Sorenson*, 190 Mont. 155, 170, 619 P.2d 1185, 1194 (1980) ("[Section 45-3-103, MCA,] has no application to a lawful entry into premises."). Like § 45-3-103, MCA, the plain language of justifiable use of force in defense of a person, § 45-3-102, MCA, also contains a prerequisite of preeminent unlawful action.

¶12 The District Court determined that Stanley could not avail himself of the affirmative defense of justifiable use of force because the deputies' entry into the apartment and actions to avoid a breach of the peace were lawful. In reaching this conclusion, the District Court determined that the deputies reasonably relied on the October 24 default judgment for possession, which the court did not rescind before the events of November 15, and that the deputies had no knowledge of the Salvation Army Agreement.

¶13 Stanley argues that the deputies' entry into the apartment was unlawful because the Salvation Army Agreement superseded the default possession document. At trial, Stanley conceded that the law enforcement officers were in possession of a lawful order but "were in effect duped by the landlord who should have gone back to court." Under the default judgment for possession, Woods was required to file a notice of satisfaction of judgment with the court once Swan paid the judgment in full, and failure to do so could result in civil liability. Woods never informed the court or the deputies of the Salvation

7

Army Agreement, and the court did not set aside the default judgment for possession before the events of November 15. While Woods' alleged failure to comply with the judgment may have resulted in civil liability,[2] it does not support a finding that the deputies' use of force in entering the apartment pursuant to a legal document was unlawful. Accordingly, the Salvation Army Agreement does not support Stanley's claim for justifiable use of force, and the District Court did not abuse its discretion in excluding it from trial.

¶14 The default judgment for possession stated that Woods "may take possession of the premises by reasonable means," and that he could request law enforcement officers to accompany him to "keep the peace." Under the judgment, Woods' action in entering the apartment with law enforcement clearly was lawful. Stanley did not produce evidence to the contrary at trial. The District Court did not abuse its discretion in denying Stanley's requested jury instruction on justifiable use of force in defense of an occupied building.

¶15 The District Court also determined that the record did not support a jury instruction on justifiable use of force in defense of a person. The court recognized that a person could lawfully enter an occupied structure and then use unlawful force. However, the court determined that Stanley did not develop the factual foundation required to argue

---

[2] The District Court noted that Swan did pursue a civil remedy against Woods. However, it is unclear that Woods even violated the default possession document. The Salvation Army Agreement provided that "any late fees and deposits are the responsibility of the tenant and must be paid for, with a receipt provided," before the Salvation Army would issue a check for the rent. The form further indicated that the Salvation Army would not process and send a rental check until it received a rental voucher signed by Woods, Swan, and a Salvation Army clerk. In addition to the back rent that the Salvation Army agreed to pay, Woods was seeking unpaid rent, late fees, and court costs. The record does not show that Swan paid those fees or that the Salvation Army received a signed voucher or processed a check before the November 15 incident.

the affirmative defense, concluding that Stanley "really isn't relying on justifiable use of force." *See King*, ¶ 24 (upholding a district court decision that, for a defendant to avail himself of a self-defense claim against a charge of deliberate homicide, there must be "sufficient facts in the record" to find that, although the defendant "purposely or knowingly caused the death of another he was justified in doing so because he reasonably believed that the use of deadly force was necessary to prevent imminent death or serious bodily harm to himself"); *State v. Logan*, 156 Mont. 48, 65, 473 P.2d 833, 842 (1970) (holding that a defendant must lay a foundation before admitting testimony on self-defense).

¶16 Throughout the trial, the State argued that the deputies were lawfully carrying out their duties under a lawful court order. Although Stanley argues that the default judgment for possession "did not allow or direct officers to forcefully enter the premises," Deputy Grove testified that he entered the apartment with his gun drawn for safety concerns because he could not see into the apartment and did not know how many people were inside or if there were any weapons. Deputy Grove further testified that he drew his gun on Stanley because he was afraid that Stanley could seriously harm him or Deputy Prater. These actions are within the scope of "keep[ing] the peace" under the default judgment for possession. A review of the record shows no evidence that the deputies' actions of drawing their guns on Stanley when he charged at them with the baseball bat were unlawful. The District Court did not abuse its discretion by refusing to instruct the jury on justifiable use of force in defense of a person.

¶17 We have determined to decide this case pursuant to Section I, Paragraph 3(c) of our Internal Operating Rules, which provides for memorandum opinions. In the opinion of the Court, the case presents a question controlled by settled law or by the clear application of applicable standards of review. The District Court did not abuse its discretion in excluding evidence of the Salvation Army Agreement and denying jury instructions on justifiable use of force in defense of an occupied structure and justifiable use of force in defense of a person.

¶18 Affirmed.

/S/ JAMES JEREMIAH SHEA

We Concur:

/S/ LAURIE McKINNON
/S/ BETH BAKER
/S/ PATRICIA COTTER
/S/ JIM RICE